Calik RIVERA, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 91–223.

Supreme Court of Wyoming.

Jan. 7, 1993.

Dissenting Opinion of Justice Urbigkit
Jan. 25, 1993.

**2**

Gerald M. Gallivan, Director (argued), Defender Aid Program, and Donald L. Fuller, Student Director, Laramie, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., Barbara L. Boyer, Senior Asst. Atty. Gen., and Mary Beth Wolff, Asst. Atty. Gen. (argued), for appellee.

Before MACY, C.J., THOMAS, CARDINE and GOLDEN, JJ., and URBIGKIT, J. Ret.*

CARDINE, Justice.

Calik Rivera appeals his conviction for possession of a controlled substance with intent to deliver, in violation of W.S. 35-7-1031(a)(ii) (1988). Most of his challenges center on the propriety of the reverse sting operation which led to his conviction. He also challenges the transactional immunity given to a witness who testified against him. Finding no error in the issues he presents, we affirm.

Appellant states the issues as follows:

I. Whether the trial court erred in instructing the jury on the entrapment issue based upon the assumption that Wyoming had adopted the subjective theory as the sole rationale for the entrapment defense?

II. Whether the trial court erred in denying defendant's motions to dismiss on the grounds of the objective theory or due process where the evidence of the prosecution demonstrated the police creation of crime, an overzealousness in developing cases, and the disregard of state statutes and regulations?

III. Whether the conviction of the appellant must be reversed because it was obtained by the police violating applicable statutes and regulations forbidding the importation and transfer of contraband except in the course of the investigation of ongoing crime?

IV. Whether testimony produced pursuant to a grant of transactional immunity in disregard of applicable statutes was critical to the prosecution's case and its wrongful admission requires reversal?

The State adds one issue for our consideration:

Whether appellant has standing to challenge the grant of immunity to Frank Compton?

Appellant was apprehended as part of an undercover "reverse sting" operation in which Jackson, Wyoming police officers

---

* Chief Justice at time of oral argument; retired January 1, 1993.

sold marijuana to persons they had targeted as drug dealers. To conduct the operation, the officers obtained about 100 pounds of marijuana from the Colorado Springs, Colorado police department. They placed the marijuana in a motel room at the 49'er Motel in Jackson and set up a video camera and a hard wire microphone for surveillance in an adjoining room.

To lure suspects into the motel room to make purchases, the police employed an informant named Frank Compton. Compton, a drug addict, had been arrested after attempting to unlawfully obtain cough syrup with codeine at two drug stores in Jackson. After his arrest, Compton agreed to help ferret out drug traffic in Jackson in exchange for having the charges against him dropped. As part of his duties for the police, Compton was to introduce suspected dealers to undercover officers.

Acting under police supervision, Compton introduced undercover officer John Bowers to appellant at appellant's residence. Appellant agreed to meet Officer Bowers and Frank Compton at the 49'er Motel to transact a drug deal. At the motel, Bowers, posing as a drug dealer, offered three pounds of marijuana to appellant for $800.00 a pound. This was $400.00 per pound less than the going rate. Appellant had only $1,350.00, so Bowers agreed to "front" him another $1,150.00 worth of marijuana, for a total of three pounds.[1] The two men exchanged the money and marijuana, and appellant left the motel room. Appellant was apprehended shortly thereafter with the marijuana.

### Failure to Instruct on Objective Theory of Entrapment

■ In his first issue, appellant argues that the trial court committed reversible error when it failed to instruct the jury on an objective, as well as subjective, theory of entrapment. He assigns as error the omission of the following requested statement from the jury instruction on entrapment:

[E]ntrapment occurs only when the criminal conduct was the product of the crea-

tive activity of the law enforcement officials. It does not arise if one is ready to commit the offense given but the opportunity.

■ The subjective theory of entrapment focuses on a particular defendant's intent or predisposition to commit the crime charged, while the objective theory focuses on the effect of the State's tactics on the hypothetical "reasonable law-abiding citizen." *See LaFleur v. State*, 533 P.2d 309, 314 (Wyo.1975); *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249 (1932) (subjective theory); *United States v. Russell*, 411 U.S. 423, 439, 93 S.Ct. 1637, 1646, 36 L.Ed.2d 366 (1973) (objective approach advocated by Stewart, J., dissenting). *See also* Laura Gardner Webster, *Building a Better Mousetrap: Reconstructing Federal Entrapment Theory from Sorrells to Matthews*, 32 Ariz.L.Rev. 605, 607 (1990).

■ The language appellant requested can be found in our entrapment cases. *See e.g., Noetzelmann v. State*, 721 P.2d 579, 581 (Wyo.1986). However, it is not "objective theory" language, as appellant claims. Although the first of the two statements appellant requested mentions the "creative activity of law enforcement officials," it does not adopt the objective theory. Even in subjective theory, there is a threshold question whether the police merely offered the defendant an opportunity to commit the crime or whether they somehow induced the defendant to act illegally. Once it has been determined that inducement is involved, the defendant's predisposition comes into question. This first sentence merely restates the threshold question of the subjective inquiry. Its origin is *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), a case which took the subjective view of entrapment. *See Dycus v. State*, 529 P.2d 979, 981 (Wyo.1974).

The second sentence which appellant requested actually concerns predisposition, and so it is difficult to understand how it could support the objective theory. In fact,

---

**1.** Officer Bowers admitted at trial that math was    not his strongest subject.

both sentences are standard, subjective entrapment language. Even had they been included, they would not have presented the objective theory of entrapment to the jury. In any case, appellant was not entitled to present that theory, because we do not recognize the objective theory of entrapment in Wyoming.[2]

■ A review of our past cases on this subject shows that Wyoming follows the subjective approach to entrapment. *See Noetzelmann,* 721 P.2d at 581; *Wright v. State,* 670 P.2d 1090, 1102 (Wyo.1983) (Rose, J., dissenting), *reh'g denied, cert. granted, opinion modified and remanded,* 707 P.2d 153 (Wyo.1985); *Janski v. State,* 538 P.2d 271, 274–76 (Wyo.1975); *Dycus,* 529 P.2d at 980–81; *Montez v. State,* 527 P.2d 1330, 1331–32 (Wyo.1974); *Jackson v. State,* 522 P.2d 1286, 1288–89 (Wyo.1974); *Higby v. State,* 485 P.2d 380, 384 (Wyo.1971). *See also* W. Michael Kleppinger, Note, *Criminal Procedure—The Entrapment Defense—The Determination of Predisposition. Janski v. State,* 538 P.2d 271 (Wyo.1975), XI Land and Water L.Rev. 265, 270 (1976). *But see LaFleur,* 533 P.2d at 314 (taking no position on the subjective/objective issue).

■ As a part of his argument, appellant urges us to either abandon the subjective theory or supplement it with the objective. We note that the subjective theory has been adopted by the majority of the states. *Kleppinger, supra,* at 270. That fact alone, of course, is no reason to retain it, and certainly does not argue against supplementing it with the objective standard. However, there are other, more practical reasons for remaining with the subjective test. This court, *in the absence of constitutional violations,* should not attempt to exercise a "chancellor's foot" veto over law enforcement practices. *See Russell,* 411 U.S. at 435, 93 S.Ct. at 1644. Presently existing entrapment law serves the purpose of ensuring that a defendant is not pun-

ished who, but for government encouragement, would not have committed an offense. The subjective test is an adequate vehicle to achieve that end.

■ We have reviewed the instruction the trial court did give, and while it did not use the language found in our cases, it did present an acceptable version of the subjective entrapment defense. The requested language would not have added anything to the instruction the court gave; it would merely have been cumulative. Therefore, it was properly rejected. *See Prime v. State,* 767 P.2d 149, 154 (Wyo.1989).

■ Since this case was argued, we have recognized a defense of "outrageous government conduct." *See Mondello v. State,* 843 P.2d 1152 (Wyo.1992). Although it bears some similarity to the objective theory of entrapment, this defense should not be confused with either of the traditional approaches to the entrapment defense. It examines neither the defendant's predisposition to commit the crime nor the likely effect of police conduct on a hypothetical reasonable man. Instead, the defense focuses purely upon the conduct of the police. The outrageous government conduct defense is available only in circumstances where the police conduct is "violat[ive of] that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment [to the United States Constitution]." *Mondello,* at 1158, *quoting United States v. Russell,* 411 U.S. at 432, 93 S.Ct. at 1643.

■ A jury instruction on this theory would not have been appropriate, because whether the government's conduct was outrageous is a question the trial court must decide. It is "the court's" conscience which is "shocked." The trial court considered, and rejected, a due process defense in this case. Whether it did so properly is the subject of appellant's next issue.

---

**2.** A very recent United States Supreme Court case, *Jacobson v. United States,* —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), appears to implicitly *combine* the subjective and objective approaches. This new method is not of constitutional dimension, and therefore is not binding on this court. We await more developments of this new theoretical approach before considering it for adoption in this state.

## Outrageous Government Conduct

■ As mentioned above, this court recognized a defense of "outrageous government conduct," separate and distinct from the subjective entrapment defense, in *Mondello v. State*. Our recognition of this defense in *Mondello* came with an acknowledgement of its narrow parameters:

[A]lthough state and federal courts have at least paid lip service to the doctrine, the defense referred to in *Russell* and *Hampton* [*v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113] has not had broad application. In the words of the Tenth Circuit Court of Appeals, the defense is "often raised but is almost never successful." *United States v. Gamble*, 737 F.2d 853, 857 (10th Cir. 1984). The murky bottom of the judicial seascape is littered with the wrecks of hopeful appeals in which defendants have launched claims of outrageous government conduct (in some cases much more egregious than that contended here) only to watch them sink after running aground on the difficult hurdle of proving the requisite level of outrageous conduct.

*Mondello*, at 1159.

Appellant argues that the conduct of the police in his case rose (or "sank") to the level envisioned in this defense, and his conviction must therefore be reversed. The trial court found that the government's conduct did not shock the court's conscience. We agree.

It should be noted that although we adopted the outrageous conduct defense in *Mondello*, we held in that case that the government's conduct was not sufficiently outrageous to justify reversal. The facts of *Mondello* were more egregious than those of this case. Mondello wanted one ounce of cocaine for his personal use, and the police tricked him into buying an extra ounce for resale purposes. He showed marked reluctance to deal in the large quantities the police were pushing, but they continually pursued him.

Here, appellant willingly entered into a transaction for three pounds of marijuana. It is difficult to believe appellant's contention that he intended that quantity of marijuana only for himself or a few close friends. He told the officers that he wanted at least two or three pounds and that he could possibly sell more later or arrange to have more sold later. While the police did "front" a portion of the purchase price, "fronting" is quite prevalent in the illegal drug business, and that alone is not enough to show outrageous government conduct.

Nor does the fact that the marijuana was offered for lower than the going rate shock our conscience. We might someday be presented with a case where the price offered for drugs was so low that the inducement would violate due process. Here, however, appellant was willing to pay two thirds of the street value.[3]

## Violation of the Wyoming Controlled Substances Act

■ Appellant next argues that the possession and sale of the marijuana by the police violated the Wyoming Controlled Substances Act, W.S. 35–7–1001 *et seq.* Appellant contends that the violation of the Act by the police should lead to reversal of his conviction. While complaining that information about the alleged illegality was kept from the jury by a *motion in limine*, appellant concedes that the information was irrelevant to his subjective entrapment defense. We might add that it was also irrelevant to any other issue before the jury. We shall therefore ignore that portion of appellant's argument which addresses the *motion in limine* and concentrate on his claim that the police infraction of the law to obtain his conviction is relevant to the issue of whether the police violated his right to due process by engaging in extreme and outrageous conduct.

---

3. Appellant's argument brings to mind the story of the French noblewoman who remarked one day to the philosopher Voltaire that she would prostitute herself, but only for a million francs each time. When Voltaire offered her a much lower price, she objected that he had impugned her character. Voltaire responded that her character was no longer at issue, only her price. Appellant's character is obvious; he saw a good deal, and he took it.

Specifically, appellant contends that the officers violated W.S. 35–7–1024 (1988) and 35–7–1031 (1988). Section 35–7–1024 reads in part:

(a) Every person who manufactures, distributes or dispenses any controlled substance within this state or who proposes to engage in the manufacture, distribution or dispensing of any controlled substance within this state, must obtain annually, on or before July 1, a registration issued by the board in accordance with its rules.

W.S. 35–7–1031 (1988) states:

(a) Except as authorized by this act, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance.

"Person" is defined in the statute as:

[any] individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, or any other legal entity.

W.S.35–7–1002(a)(xviii) (1988).

As the State points out, however, exception is made in this statute for law enforcement officers while in the course of their duties:

All duly authorized peace officers including any special agents or other personnel appointed by the commissioner, while investigating violations of this act in performance of their official duties, shall be immune from prosecution under this act.

W.S. 35–7–1043 (1988).

Appellant, however, contends that the immunity provisions of this statute did not apply here because there was no pre-existing "violation" to investigate when the police obtained and sold the marijuana. He also argues that while immunized, the possession was still illegal, and this illegality should factor into a due process analysis.

We must first construe the statute to determine whether investigative immunity extends to the circumstances of this case. When enforcing or construing a statute, this court looks only to the intent of the legislature. *Allied–Signal, Inc. v. State Bd. of Equalization,* 813 P.2d 214, 219 (Wyo.1991). When the words used are clear and unambiguous, that language establishes the rule of law. *Id.* A statute is ambiguous only where its meaning is vague or ambiguous and subject to varying interpretations. *Id.,* at 219–20. Only if the wording is ambiguous or unclear to the point of demonstrating obscurity with respect to the legislative purpose or mandate do we resort to additional construction. *Id.,* at 219.

The scope of the words "while investigating violations of this act in performance of their official duties" is sufficiently ambiguous that we must resort to further statutory construction beyond their plain meaning. Appellant argues that only a pre-existing violation may be investigated within the meaning of the statute. Thus, in appellant's view, officers may not possess and distribute controlled substances where that possession and distribution is designed merely to *result* in a violation of the Act. Appellant's view assumes a legislative intent to restrict police activities connected with narcotics enforcement.

Often, the only method of catching violators of the narcotics laws is to employ the deception or ruse of setting up a "sting." A controlled sale is as legitimate a tactic as a controlled buy, and may be more effective in putting drug dealers behind bars. A drug retailer will obviously be willing to purchase in larger quantities than he intends to sell in any given transaction. A controlled sale gives the police an opportunity to catch him with wholesale, rather than retail amounts, which more realistically reflects the volume of his drug business.

In order to run such an operation, the police need controlled substances to sell to its targets. Absent immunity, no reasonable officer would engage in such an operation. Considering the comprehensive nature of the Wyoming Controlled Substances Act of 1971, *see* 1971 Wyo.Sess. Laws ch. 246, we believe that had the legislature wished to *exclude* controlled sales of narcotics designed to snare drug dealers, it would have explicitly prohibited such sales.

Furthermore, where suspected dealers are targeted, as in this case, their suspected pre-existing violations provide the inves-

tigatory rationale for running the operation. Thus, a suspected "violation" of the Controlled Substances Act *is* being "investigated" at the same time as a new violation is "occurring." Accordingly, the statute expressly or implicitly allows such operations, and the intent of this statute is to allow the police to be exempt from prosecution for technical violations of the controlled substance law which are incurred during their legitimate investigations of violations of the Controlled Substances Act.

■■■ Turning to appellant's second contention that the quantity of marijuana involved should have been registered, § 3.26(a)(ii) of the Regulations of the Board of Pharmacy provides exemption from registration for "any officer or employee of any state, or any political subdivision or agency thereof who is engaged in the enforcement of any state or local law relating to controlled substances and is duly authorized to possess controlled substances in the course of his official duties." For the same reasons as those favoring immunity, we believe that had the Board of Pharmacy intended to preclude enforcement activities involving reverse sting operations, it would have done so expressly. Even if the possession was unregistered or otherwise illegal, this does not implicate a violation of due process. The California Court of Appeals recently faced a similar situation. That court stated:

> The possession of the rock cocaine by Officer Qualls was not legal, but we conclude there was no violation of the statutes governing the disposition of the contraband. In any case, we fail to perceive in what manner the source of the cocaine, or Qualls' illegal possession of the contraband would have affected defendant's criminal conduct or had a bearing on his due process rights.

*People v. Wesley,* 224 Cal.App.3d 1130, 274 Cal.Rptr. 326, 331 (1990), *review denied* (1991).

The outrageous government conduct defense focuses on police conduct. We might someday be faced with illegal conduct by the police, immunized or not, serious enough to infringe on a defendant's right to due process. However, in this case, even if the actions of the police were illegal in a technical sense, they were not of the caliber to constitute an infringement of the defendant's due process rights. Accordingly, we hold that the acquisition and use for investigatory purposes without registration of the marijuana did not violate appellant's right to due process.

### Grant of Immunity to Frank Compton

■■■ Finally, appellant challenges the grant of full transactional immunity to Frank Compton. The general rule is that absent some showing of improper coercion of the witness or tainted testimony arising from the grant of immunity, a defendant lacks standing to contest the State's grant of immunity to a witness against him. *See e.g., United States v. Lewis,* 456 F.2d 404, 409–10 (3rd Cir.1972); *State v. Rice,* 411 N.W.2d 260, 262 (Minn.App.1987). Appellant has shown no such coercion or taint derived from the grant of immunity. Therefore, he lacks standing to contest it.

### Conclusion

Appellant has presented no reversible error to this court. His conviction is affirmed.

URBIGKIT, Justice, Retired, dissenting.

## I.  INTRODUCTION AND FACTUAL BACKGROUND

It was "dry" in Jackson, Wyoming—meaning the availability of marijuana or other illegal drugs for purchase around town was limited. Knowing this, the local police set about curing the problem. By arrangement with the Colorado Springs, Colorado police force, a 100 pound "bale" of marijuana was acquired by the Jackson, Wyoming Police Department. The marijuana was brought into the community, by the police, to see if sales could be made at below-market prices using a lifelong drug addict, Frank Compton (Compton), as an informant/dealer. The informant was provided money, housing, and drugs as com-

pensation for his sales solicitation, i.e. drug peddling.[1] Was this entrapment? [2]

The assistance provided by this admitted career criminal, as an agent of the police, was to help improve the supply of drugs in the community by a "reverse sting" program of community advertisement and sales consummation.[3] Unfortunately, for the appellant, he bought into the well-advertised bargain, in part on credit, which turned into a conviction and a penitentiary sentence of three to five years.

Appellant, Calik Rivera (Rivera), a Puerto Rican by heritage, was particularly unlucky when contrasted with the treatment Compton received. Compton's career as an informant for the Jackson police lasted about three months. Despite his admissions to both twenty-eight years of drug use and equal time participation as a performer in the illegal drug trade, Compton was compensated for his activity as a police agent. The police furnished Compton: a house, in rental-property-scarce Jackson; an automobile for his use; $750 a month to pay for rent on the house, gasoline for the automobile, food, utility bills, doctor bills and medical expenses; and $1,420 for methadone from California to assuage his drug habit.

The Jackson police may not have received the full benefit of their bargain with Compton. The prosecution of another target of the "reverse sting" operation, TL (hereinafter TL), which was scheduled to follow Rivera's, was dismissed because of the unreliability of the state's informant, Compton.[4] The prosecutor further stated that nine persons had been arrested on the same day, during the same "reverse sting" operation, and only the prosecution of the individual whose trial followed that of Rivera was dismissed on the basis of Compton's unreliability. It is apparent that defense counsel remembered the facts of this conversation with the prosecutor somewhat differently. He stated in his motion regarding the quality of the information furnished:

3. As a result of the motion for new trial in the Rivera case, Frank Compton's testimony at the hearing on the motion and Compton's contact with law enforcement and the County Attorney, the State dismissed the [TL] case. The undersigned has been informed by the County Attorney that the reason for the dismiss-

---

1. This man-about-town, "undercover" police-sponsored agent, Compton, had an interesting history. Age of approximately forty-two, Compton admitted to twenty-eight years of use and sale of controlled substances which covered the statutory offenses from marijuana and cocaine to heroin. What is fascinating is that the impeachment effort of defense counsel, regarding a narcotics arrest, was sustained upon objection by the prosecution. The record, otherwise, reveals no conviction in the twenty-eight years of his involvement in the "business." The particular offense, for which the defense counsel attempted impeachment and which was negotiated for Compton's "cooperation," involved acquisition of two bottles of codeine "cough syrup" which Compton said an associate had supplied. Compton's only other conviction, to which he admitted, during his lifetime of drug involvement and crime was an offense of possession of stolen property. However, his capacity to escape personal responsibility was apparently equaled by his entrapment capability. The record reflects that the sting operation for sale of below-market price marijuana in the "dry" town netted nine arrests in one afternoon.

2. Michael Senneff, *Entrapment in the Federal Courts*, 1 U.S.F.L.Rev. 177, 177 (1966) (quoting 22 C.J.S., *Criminal Law* § 45(2), at 138) provides the well accepted definition: "Entrapment is 'the conception and planning of an offense by an officer and the procurement of its commission by one who would not have perpetuated it except for the trickery, persuasion, or fraud of the officer.'"

3. In this case, the informer, Compton, was overtly acting as an agent of the state in providing the solicitation services for the sales of the controlled substance which had been brought to the scene and provided by law enforcement. *Com. v. Colon*, 33 Mass.App.Ct. 304, 598 N.E.2d 1143 (1992). Any person cooperating with a law enforcement agency is a "law enforcement agent" for the purpose of entrapment. *State v. Kummer*, 481 N.W.2d 437 (N.D.1992).

4. To be completely accurate, the prosecutor stated, in the memorandum brief attacking contentions regarding the dismissal of the following criminal prosecution of another target, that he had only considered the informant, Compton, to be unreliable for the purpose of that next case, but the prosecutor had not considered Compton to be unreliable or that his testimony was not believable with regard to the case against Rivera.

al was the unreliability of Compton, his inability to distinguish fact from fiction and his obvious addiction to drugs and the influence of drugs on his testimony.

This exchange came in Rivera's second motion for a new trial based on selective prosecution or unreliability of the principal witness. The first motion for a new trial, which was previously denied and predated the dismissal of the TL case, came on the possibility of recanted testimony. The second motion followed the dismissal of the pending prosecution against TL, which had been scheduled to immediately follow the Rivera trial.

Was this outrageous police conduct? Was this illegal interstate transportation of controlled substances? Was this entrapment? These are the concepts which will be encountered in this dissent as I search to draw the line between solicitation of crimes by law enforcement and the responsibility of individuals who violate the state's criminal code.

## II. TRAPS, ENTICEMENT, ENTRAPMENT

This appeal enters the curious and subterranean world of a segment of the law—entrapment—which is completely an American tradition. The basic concern, never fully answered, is how much should law enforcement officials assist, or create occurrences of criminality, when the desired result is to capture and punish those persons targeted for prosecution. Upon inversion into that world and its connections to American government, politics, judicial conduct and law enforcement today, one is given to an immediate reaction similar to what is seen upon the slimy upturned surface when a damp flat rock is overturned in the heat of the day. In reality, we look at accepted or justified law enforcement violations of due process rights. A thoughtful discussion is provided by Gail M. Greaney, Note, *Crossing the Constitutional Line: Due Process and the Law Enforcement Justification*, 67 Notre Dame L.Rev. 745, 795–97 (1992) (quoting *Olmstead v. United States*, 277 U.S. 438, 479, 48 S.Ct. 564, 572–

73, 72 L.Ed. 944 (1928)) (footnotes omitted), in which she concludes:

Whenever a nation is faced with an evil that threatens the underpinnings of society, it is tempting to compromise personal liberties to combat the threat. Such is the case regarding the current fight against narcotics in the United States. Senator Edward M. Kennedy, in a recent address to the American Bar Association, discussed the role of the Constitution in the nation's battle against drugs. Recognizing that the war on drugs is beginning to exert pressure on the Fifth Amendment right to due process, he admonished: "The Constitution is perfectly capable of accommodating the legitimate interests of law enforcement—but end runs around the Bill of Rights are unacceptable, and it is irresponsible for any administration committed to the rule of law to try them." It appears from analyzing many of the reverse sting cases that have rejected the due process defense, that courts are coming dangerously close to ignoring a defendant's due process rights in the face of public policy concerns regarding the war on drugs. "Our constitutional rights do not contribute to the drug problem, and compromising them will not solve it. We do not need to trample the Bill of Rights to win the war on drugs." The fact that our nation is faced with a social problem that is daily approaching tragic proportions does not mean that due process rights need no longer be protected. The Constitution has endured for two centuries because the courts have not sacrificed its protections in the face of current social problems. Judge Zagel in *Stokes v. City of Chicago* [744 F.Supp. 183, 188 (N.D.Ill.1990)] eloquently expressed the enormity of the problem facing law enforcement officers in combatting crime:

"Policing is a lofty calling, vital to the public weal, often heroic in action. The grace and worth of the work usually remains unseen and unappreciated by those it serves. In grime and squalor, facing danger and fury, bearing witness to what is worst in men

and women—even police officers sometimes lose sight of the dignity of their service."

Nevertheless, these problems, and the gravity of the social harms resulting from narcotics offenses in the United States, do not justify violating the due process rights of individuals. Although the law recognizes that at times ends may justify means, the essence of constitutional due process is that lawlessness will not be tolerated, no matter how so-

cially desirable the goal. As Justice Brandeis cautioned:

"Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." [5]

**5.** The author also quoted, as a footnote in the law journal, an excerpt from an opinion of Justice McKenna in *Weems v. United States*, 217 U.S. 349, 373, 30 S.Ct. 544, 551, 54 L.Ed. 793 (1910), eighty-three years ago, which will serve as a challenge for writer and reader throughout this discussion:

"Legislation, both statutory and constitutional, is enacted, it is true, from an experience of evils, but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, 'designed to approach immortality as nearly as human institutions can approach it.' The future is their care and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by precedent into impotent and lifeless formulas. Right declared in words might be lost in reality."

Greaney, *supra*, 67 Notre Dame L.Rev. at 795–96 n. 297.

Rights stated in the words of the Wyoming Constitution are, by this majority's decision, lost in fact from an apparent decisional weakness derived from perceived political reality. *See* Ralph A. Rossum, *The Entrapment Defense and The Teaching of Political Responsibility: The Supreme Court as Republican Schoolmaster*, 6 Am. J.Crim.Law 287 (1978). That subject was included in an introduction by Edward G. Mascolo, *Due Process, Fundamental Fairness, And Conduct That Shocks The Conscience: The Right Not To Be Enticed Or Induced To Crime By Government And Its Agents*, 7 W.New Eng.L.Rev. 1, 2 (1984) (quoting *Rochin v. California*, 342 U.S.

165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)) (footnotes omitted):

It is not surprising, therefore, that methods employed. in the administration of the criminal law have generated (and inspired) intense debate concerning the scope of permissible or acceptable behavior by government in its efforts to combat the destabilizing influences of antisocial behavior within a system of justice committed to standards of civilized conduct by government and its agents. In short, a free society about to do battle with its criminal elements must be prepared to say how far it will permit its government to go in "fighting the good fight" against crime. Will that society insist upon standards of conduct that, while potentially offensive to "some fastidious squeamishness or private sentimentalism about combatting crime too energetically," do not "shock[ ] the conscience," or will it sanction methods of law enforcement that make the government virtually indistinguishable from the criminal?

The author further stated his direction:

It is the thesis of this article that a society which tolerates criminal behavior and methods by its government in combatting crime is a society that has fatally blurred the fundamental distinction between the rule of law and the lawless enforcement of the criminal law, and by so doing, cannot long endure. Specifically, this article will step beyond the Supreme Court's suggestion and will propose a due process defense, supplemented by principles of judicial integrity and public policy, against outrageous practices of government agents in the enforcement of the criminal laws that shock the conscience and offend civilized standards. of conduct. Further, this defense will be an absolute bar to the government invoking judicial processes to secure a conviction of an individual against whom such methods have been employed. It will require the courts to close their doors to "such prostitution of the criminal law" so as "not to be made the instrument of wrong."

Mascolo, *supra*, 7 W. New Eng.L.Rev. at 2–3 (quoting *Sorrells v. United States*, 287 U.S. 435, 456–57, 53 S.Ct. 210, 218, 77 L.Ed. 413 (1932) (footnotes omitted).

Justice Brandeis, dissenting sixty-five years ago in *Olmstead*, 277 U.S. at 485, 48 S.Ct. at 575, understood:

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

*See also* Greaney, *supra,* 67 Notre Dame L.Rev. 745.

Aimed at political corruption, the F.B.I. ABSCAM campaign was undoubtedly the most far flung "sting" operation ever attempted. Judge Pratt, in one of the multitude of resulting cases, stated:

> The cynicism and hippocracy displayed by corrupt officials, pretending to serve the public good, but in fact furthering their own private gain, probably pose a greater danger to this country than all of the drug traffickers combined. Corrupt

leaders not only betray their constituents, but also contribute to a moral decay in American society that many view as the forerunner of economic, political and social disaster.

*United States v. Myers,* 527 F.Supp. 1206, 1229 (E.D.N.Y.1981), *aff'd. in part and rev'd and remanded in part on other grounds,* 692 F.2d 823 (2nd Cir.1982), *cert. denied* 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983).

Entrapment and the associated conduct of "sting" operations have a particular pertinency in Wyoming, at this time, following the operation first conducted in the Pinedale, Wyoming High School. The operation was apparently conducted by the State Department of Criminal Investigation in conjunction with a contracted adult agent who pretended to be a student. A similar program followed in Lyman, Wyoming. Both "stings" immediately ended when a supervising state agent committed aggravated assault at a bar in Missoula, Montana. The Wyoming narcotics agent hit a Missoula resident over the head with a beer bottle in that offense, resulting in a cut requiring ten stitches. The agent's accommodative plea bargain resulted in a deferred sentence, small fine, and agreement against reappearance in the Montana community. Publicity of events in Pinedale, Lyman and Montana brought a compelling recognition to the state of the underworld from which entrapment cases develop.[6]

I dissent in this case. I recognize that the morass of increasing criminality per-

**6.** Entrapment, as an issue in criminal case appellate litigation, has probably replaced ineffectiveness of defense counsel and challenged conduct of prosecutors as the most prevalent issue in current appeals. A Westlaw search for 1992 under the word "entrapment" reveals 106 cases from the state courts and 111 from the federal courts, which includes the principal decision of the year, *Jacobson v. United States,* —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). *Jacobson* involved a Nebraska farmer enticed by a multiple sting operation into the purchase of kiddie porn. No less than fifty law journals and other scholarly contributions on the subject of entrapment can be found, including a very comprehensive book authored by Professor Paul Marcus, *The Entrapment Defense* (1989). A number of interesting examinations are avail-

able relating to the political corruption investigation of ABSCAM; the court corruption "sting" in Philadelphia; and the Cook County, Illinois court corruption investigation known as "Greylord." The Cook County investigation resulted in a senate select committee to study undercover activities of the components of the Department of Justice, Senate Report No. 682, 97th Congress, 2nd Sess. 369 (1982). *See* Tamarkin, *The Judge Who Wore A Wire,* 70 ABA J. 76 (1984); Katherine Goldwasser, *After ABSCAM: An Examination of Congressional Proposals to Limit Targeting Discretion in Federal Undercover Investigations,* 36 Emory L.J. 75 (1987); and Andrew Majeske, Note, *The Greylord Investigation Guidelines: Protection for Greylord Attorneys,* 16 Loy.U.Chi.L.J. 641 (1985).

meating American society cannot be ignored. I also recognize that entrapment should not constitute a usually accepted defense. Finally, I recognize that a properly conducted sting operation is not necessarily inappropriate. However, I do join great scholars among the judiciary; Justice Brandeis, Justice Roberts, Justice Jackson, Justice Frankfurter, and Justice Brennan, and equally competent scholars within the state judiciary, who have found that what is done within this field of sting operations, entrapment, and judicial response is frequently done for the wrong reason, in the wrong way, with a resulting adverse permanent result on the promotion of idealism in a democratic society. It is my belief that the time is here for every jurisdiction to re-examine the generic subject of society's limitation on and responsibility for inviting, soliciting and creating crimes in order to catch the unwary (innocent or guilty) and have punishment inflicted which is seemingly appropriate therefor. We should recheck our basic principles to examine whether criminal law is directed to punish for past crimes or to create an environment directed to entrap those likely or accidentally available to commit future crimes. Richard C. Donnelly, *Judicial Control of Informants, Spies, Stool Pigeons, And Agent Provocateurs*, 60 Yale L.J. 1091 (1951); Mark M. Stavsky, *The "Sting" Reconsidered: Organized Crime, Corruption and Entrapment*, 16 Rutgers L.J. 937 (1985).

It is thoughtfully recognized that three persistent themes reflecting basic governmental and societal responsibility are found in the entrapment case law and the corollary due process concept of the outrageous government conduct doctrine. First, there is the concern for judicial integrity. Second, the apprehension of criminals and consequent punishment of persons who commit violation of our laws. And, third, the concern which addresses law enforcement activities which may passively or actively be involved in the targeted crime itself. Subcategorized, within this category of concerns for a democratic nation, is whether the activity of law enforcement provides just an opportunity for the predisposed miscreant; or, otherwise, whether the activity of law enforcement instigated the actual criminal activity.

A central thesis of one of the early entrapment cases, *Saunders v. People*, 38 Mich. 218, 221–22 (1878), Marston, J., concurring, despite the operation rejection it seems to have suffered, deserves repeating:

"I cannot ... silently permit the extraordinary course adopted by the police officers in this case to pass unnoticed and uncondemned.... The course pursued by the officers in this case was utterly indefensible. Where a person contemplating the commission of an offense approaches an officer of the law, and asks his assistance, it would seem to be the duty of the latter, according to the plainest principles of duty and justice, to decline to render such assistance, and to take such steps as would be likely to prevent the commission of the offense, and tend to the elevation and improvement of the would-be criminal, rather than to his farther debasement. Some courts have gone a great way in giving encouragement to detectives, in some very questionable methods adopted by them to discover the guilt of criminals; but they have not yet gone so far, and I trust never will, as to lend aid or encouragement to officers who may, under a mistaken sense of duty, encourage and assist parties to commit crime, in order that they may arrest and have them punished for so doing. The mere fact that the person contemplating the commission of a crime is supposed to be an old offender can be no excuse, much less a justification for the course adopted and pursued in this case. If such were the fact, then the greater reason would seem to exist why he should not be actively assisted and encouraged in the commission of a new offense which could in no way tend to throw light upon his past iniquities, or aid in punishing him therefor, as the law does not contemplate or allow the conviction and punishment of parties on account of their general bad or criminal conduct, irrespective of their

guilt or innocence of the particular offense charged and for which they are being tried. Human nature is frail enough at best, and requires no encouragement in wrong-doing."

Paul Marcus, *The Entrapment Defense,* § 1.03 at 8–9 (1989).[7]

### III. RULES, REALITIES AND RATIONALES—THE ADAPTATIONS

#### A. *Entrapment in the Subject and Objective*

There are as few as three or as many as five rule rationales applied today within the avalanche of case precedents for entrapment principles of law. It should initially be recognized that the use of the word "defense" is a misnomer for an intrinsic legal theory. Entrapment is an *exoneration* for perceived (or admitted) criminal conduct. Paul H. Robinson, *Criminal Law Defenses: A Systemic Analysis,* 82 Colum.L.Rev. 199 (1982); *see also,* Laura Gardner Webster, *Building a Better Mousetrap: Reconstructing Federal Theory From Sorrells to Mathews,* 32 Ariz. L.Rev. 605, 607 n. 5 (1990); and *Sherman v. United States,* 356 U.S. 369, 380, 78 S.Ct. 819, 824–25, 2 L.Ed.2d 848 (1958), Frankfurter, J., concurring in the result.

The required inquiry tests: "[t]o determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Sherman,* 356 U.S. at 372, 78 S.Ct. at 820–21. Before we seek to fit the police conduct in this case and other contemporary activities in this state into some rule, doctrine, or justification, it is necessary to apply at least a cursory delineation of these multiple defenses.[8]

The three, four, or five congruent or alternative defenses are formed from two broadly grouped categorizations: the subjective, or sometimes the federal model; and, the direct alternative which is designated the objective defense. Generally, it is considered that these approaches to entrapment defenses do not have a constitutional basis. Although not generally so directly stated, the defense comes from a supervisory or integrity maintenance responsibility of the judiciary to rebuff overreaching law enforcement techniques. Marcus, *supra,* at § 1.03.

Justice Roberts, writing in *Sorrells v. United States,* 287 U.S. 435, 457, 53 S.Ct. 210, 218, 77 L.Ed. 413 (1932), based the doctrine of entrapment

> on a fundamental rule of public policy. The protection of its own functions and the preservation of the purity of its own temple belongs only to the court. It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law. The violation of the principles of justice by the entrapment of the unwary into crime should be dealt with by the court no matter by whom or at what stage of the proceedings the facts are brought to its attention.

Justice Brandeis, dissenting in *Casey v. United States,* 276 U.S. 413, 425, 48 S.Ct. 373, 376, 72 L.Ed. 632 (1928), agreed that both control of governmental law breaking and judicial integrity were reasons for judicial application of entrapment. *See State v. Kummer,* 481 N.W.2d 437 (N.D.1992), Vande Walle, J., specially concurring. The significance of the basic theory of entrapment comes from comparison with the outrageous conduct defense, which constitutes a third "defense" and is derived directly from constitutional due process, as an adaptation of *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

Entrapment dogma is thus divided: either, the subjective test, which headlines

---

**7.** As a historical reference, a portion of this quotation was earlier recognized and the thesis of the case approved in the Wyoming entrapment case, *Lafleur v. State,* 533 P.2d 309 (Wyo. 1975), in an opinion authored by Justice A.G. McClintock.

**8.** Like nearly all jurists and most text writers and commentators who use the word "defense" for convenience, so will I in this dissent, even though philosophically and logically it is found to be an inaccurate characterization of either or both entrapment or outrageous governmental conduct.

predisposition of the accused; or, the objective test, which examines the conduct of the entrapping law enforcement agency officials. "The objective view analyzes entrapment from a position protective of the judicial role in achieving convictions." Webster, *supra*, 32 Ariz.L.Rev. at 617. Professor Webster says: "If the subjective view of entrapment turns upon whether or not the government has made a new criminal of an 'unwary innocent,' the objective test turns upon government creation of new crime." *Id.* at 617.

The black letter components of the federal entrapment defense include (1) excessive governmental inducement to commit a crime aimed at (2) a non-predisposed accused. These two elements and the weight each receives account for most of the disagreement in the federal system on what constitutes entrapment. * * *

\* \* \* \* \* \*

To begin with the minority objective test for entrapment, the importance of the judiciary is to define clear boundaries for law enforcement and to identify instances in which law enforcement breaches that boundary. The selection of a target adds little to an endeavor which is deemed overreaching from its inception. The objective view analyzes entrapment from a position protective of the judicial role in achieving convictions. *Id.* at 617.

### B. *Outrageous Government Conduct—Where Is Due Process?*

Despite the obdurate support of the subjective definition of entrapment, by normally five of the nine members of the United States Supreme Court, its philosophic idiosyncracies and operational invalidity have been strenuously attacked by most commentators and in many state court decisions. In order to fend off the most extreme improvidences of the subjective test, the due process—outrageous governmental conduct doctrine—was developed as an additional principle. This adaptation understood predisposition might exist in the mind of the suspect, but the entrapping activity

conducted by law enforcement was completely outrageous.

It is important to understand that the due process, outrageous conduct, principle is correlative to the subjective rule in those jurisdictions. The outrageous conduct principle is semi-meaningless, except when considered in application in the federal courts, to escape the obvious societal invalidity of the subjective rule theory of "anything goes." Like the casual discard of outrageous governmental conduct—due process—applied by the majority in this present decision, the adaptation has seldom been found in conjunction with the subjective doctrine to be strenuously protective of the defendant, *State v. Agrabante*, 73 Haw. 179, 830 P.2d 492 (1992), apparently from a fear of a *sub rosa* application of objective causality. *United States v. Payne*, 962 F.2d 1228 (6th Cir.), *cert. denied* — U.S. ——, 113 S.Ct. 306, 121 L.Ed.2d 229 (1992); *United States v. Warren*, 747 F.2d 1339 (10th Cir.1984). The due process approach was applied in *United States v. Twigg*, 588 F.2d 373 (3rd Cir. 1978), by consideration of fundamental fairness. *See also United States v. West*, 511 F.2d 1083 (3rd Cir.1975) and *Greene v. United States*, 454 F.2d 783 (9th Cir.1971).

The Tenth Circuit Court of Appeals has, however, considered the viability of the outrageous conduct defense with comment that there was no circuit court known to have denied the viability of the defense. With a comprehensive list of citations, the Tenth Circuit noted:

Notwithstanding the lack of a clear holding on outrageous conduct by the Supreme Court, most of the circuits, including this one, have recognized the viability of the outrageous conduct defense. *See, e.g., United States v. Jacobson*, 916 F.2d 467, 469 (8th Cir.1990) (en banc), *rev'd on other grounds*, — U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992); *United States v. Nichols*, 877 F.2d 825, 827 (10th Cir.1989); *United States v. Simpson*, 813 F.2d 1462, 1464–65 (9th Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987); *United States v. Arteaga*, 807 F.2d 424, 426 (5th Cir.1986); *United States v. Kelly*, 707

F.2d 1460, 1468 (D.C.Cir.), *cert. denied,* 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983); *United States v. Capo,* 693 F.2d 1330, 1336 (11th Cir.), *cert. denied,* 460 U.S. 1092, 103 S.Ct. 1793, 76 L.Ed.2d 359, *modified on other grounds sub nom. United States v. Lisenby,* 716 F.2d 1355 (11th Cir.1983); *United States v. Myers,* 692 F.2d 823, 837 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983); *United States v. Jannotti,* 673 F.2d 578, 607 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Johnson,* 565 F.2d 179, 182 (1st Cir.1977), *cert. denied,* 434 U.S. 1075, 98 S.Ct. 1264, 55 L.Ed.2d 780 (1978); *United States v. Quintana,* 508 F.2d 867, 878 (7th Cir.1975). We know of no circuit that has denied the viability of this defense.

*United States v. Mosley,* 965 F.2d 906, 909 (10th Cir.1992).

In its review of the case law involving the outrageous defense, the Tenth Circuit Court of Appeals, in assessing its usage, separated out pervasive facts, including: (a) excessive government involvement in creating the prosecuted crime; (b) creating a new crime compared to involvement in ongoing criminal enterprise; (c) putting people in business and setting up crime by providing supplies and expertise for the illegal activity; (d) inducement and deceit; and (e) coercion. *Mosley,* 965 F.2d at 910–12.

It is interesting that the agent in *Mosley* was the same individual apparently involved in the Pinedale and Lyman stings

and who was convicted of a criminal offense (misdemeanor) for the aggravated assault which he committed in Montana. Although *Mosley* was unsuccessful, in regard to an outrageous conduct defense, the *Mosley* tests, including bargain price coercion, specifically fit the facts of how Rivera came to be intertwined with the offense for which he was convicted.

Comparably, in *Payne,* 962 F.2d 1228, the court advanced a four point test for outrageous conduct analysis. The first factor appraises the current need for law enforcement to provide the kind of governmental conduct involved. The second factor considers whether the criminal enterprise pre-existed the undercover investigation. The third factor considers whether the governmental agent directed or controlled the enterprise, and the fourth factor tests the impact of the law enforcement activity on the commission of the crime. Under the factual circumstances that existed in this case, it is apparent that the enterprise created and operated by the Jackson police failed on all four tests. However, like recognition accorded in most cases, the majority accords a subjective analysis to a subjective concept with a conclusion that "this entrapment program was not outrageous." Explanations of why this is so are conveniently hidden in semantics and undisclosed reasoning.

The due process, outrageous conduct, concept has no real office in conjunction with the objective test because that test examines conduct of the government in first analysis.[9]

---

9. Considering that outrageous conduct defenses fail to be accepted with such regularity, there is a surprising volume of cases and commentator analysis. The frequency of attempted use was no doubt prompted by the recognized dangers from the associated evidentiary effects from evidence of prior misconduct used to show predisposition embodied in the subjective approach. This was witnessed by this court in *Mondello v. State,* 843 P.2d 1152 (Wyo.1992). *See also* Ben A. Hardy, *The Traps of Entrapment,* 3 Am. J.Crim.L. 165, 202 (1974), where in conclusion and recommendation the author stated:

In summary, it appears that the entrapment defense is one of last resort, which must be used cautiously. Prior to the trial of the issue

every attempt should be made to learn as much as possible about the government's case and predisposition evidence. The entrapment defense under the subjective approach is much too dangerous a defense to be used as a matter of course, and thus is suggested in only a few ideal cases.

See generally on outrageous conduct defenses, Kevin H. Marino, *Outrageous Conduct: The Third Circuit's Treatment of the Due Process Defense,* 19 Seton Hall L.Rev. 606 (1989); similarly, Stephen A. Meister, Note, *When Nothing Is Shocking: The Ninth Circuit Degrades The Outrageous Government Conduct Defense,* 22 Loy. L.A.L.Rev. 843 (1989); and Richard Lawrence Daniels, Note, *United States v. Simpson: "Outrageousness!" What Does It Really Mean?—An Ex-*

### C. Then, Generally, Where Are We In Entrapment?

Consequently, we have the subjective test; the subjective test as supplemented by the outrageous government conduct doctrine; and, the objective test. There is a fourth approach specifically detailed in the Florida case of *Cruz v. State*, 465 So.2d 516 (Fla.), *cert. denied* 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985). The test was derived from New Jersey state law development, and is now found in other states, in a less defined fashion, for example, New Mexico and perhaps Utah. It is the construction of a principle which considers the entire circumstance, both the conduct of the police and of the targeted criminal. This approach has aspects of the philosophy of due process incorporated in the totality of the circumstances examination. The result is that no need for the super-ameliorative concept of outrageous governmental conduct remains. In effect, this is a combination of the objective and the subjective test approaches.

An interesting analysis, for evaluation of the most recent United States Supreme Court decision, *Jacobson v. United States*, — U.S. —, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), is provided by *United States v. Beal*, 961 F.2d 1512 (10th Cir.1992). The Tenth Circuit Court of Appeals recognized: " 'Law enforcement officials go too far when they "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." ' " *Beal*, 961 F.2d at 1517 (quoting *Jacobson*, — U.S. at —, 112 S.Ct. at 1536 and *Sorrells*, 287 U.S. at 442, 53 S.Ct. at 213). The court held a police agent's original inducement for a drug transaction provided the motive for the criminal acts charged. *Beal*, 961 F.2d at 1517. We are left then with a question of whether *Jacobson* and its progeny, *Beal*, represent a federal trend toward the amalgam of *Cruz*.

The language of *Jacobson* suggests the emerging federal trend. In *Jacobson*, — U.S. at — – —, 112 S.Ct. at 1537–38, a Nebraska farmer who had once ordered two magazines and a brochure from a California adult bookstore was targeted by federal authorities investigating illegal receipt through the mails of sexually explicit depictions of children. At the time Jacobson ordered the original materials, no violation of federal or state law occurred. His name, however, was on a mailing list seized by federal authorities who, for two and one-half years, continued to solicit Jacobson to make another, now illegal, purchase. Justice White, writing for the majority, said the government failed to prove that Jacobson was predisposed to break the law before the government, by its own admission, induced Jacobson to commit the crime. *Id.* at —, 112 S.Ct. at 1541. Justice White relied on *Sorrells'* "creative activity" precedent to argue that the court must first consider the governmental conduct in entrapment cases as part of the predisposition determination. *Id.* at — – — n. 2, 112 S.Ct. at 1540–41 n. 2.

There is yet a fifth application suggested for entrapment defenses. It has aspects of the objective, but is in reality an exception to the subjective. The standard was most currently articulated in the initial panel reversal of *Jacobson*, which was then reconsidered en banc, *United States v. Jacobson*, 916 F.2d 467 (8th Cir.1990), *cert. granted* — U.S. —, 111 S.Ct. 1618, 113 L.Ed.2d 716 (1991), *rev'd on other grounds* — U.S. —, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). It is this second appellate reversal, confirming conviction, which was itself then reversed in *Jacobson*, — U.S. —, 112 S.Ct. 1535. This standard directed "that governmental suspicion of defendant's predisposition is a prerequisite for solicitation." Terri L. Chambers, Note, *United States v. Jacobson: A Call For Reasonable Suspicion of Criminal Activi-*

---

amination Of The Outrageous Conduct Defense, 18 Sw.U.L.Rev. 105 (1988). Paul Marcus, *The Due Process Defense In Entrapment Cases: The Journey Back*, 27 Am.Crim.L.Rev. 457, 457 n. 1 (1990), stated: "Certainly, the argument has proved more successful in state courts than in

federal courts. *See generally*, P. Marcus, *The Entrapment Defense* 308–14 (1989) (state judges often take more expansive view of due process claims, particularly in light of individual state constitutional provisions)."

*ty as a Threshold Limitation on Government Sting Operations*, 44 Ark.L.Rev. 493, 505 (1991). That author found a source for the reasonable suspicion criteria in the first federal entrapment case reversal. *Woo Wai v. United States*, 223 F. 412 (9th Cir.1915). *See also Rothman v. United States*, 270 F. 31 (2nd Cir.), *cert. denied* 254 U.S. 652, 41 S.Ct. 149, 65 L.Ed. 458 (1920). A similar thesis and identical recognition is accorded in Maura F.J. Whelan, *Lead Us Not Into (Unwarranted) Temptation: A Proposal To Replace The Entrapment Defense With A Reasonable–Suspicion Requirement*, 133 U.Pa.L.Rev. 1193 (1985).

Clearly entrapment is a facet of a broader problem. Along with illegal search and seizures, wire tapping, false arrest, illegal detention and the third degree, it is a type of lawless law enforcement. They all spring from common motivations. Each is a substitute for skillful and scientific investigation. Each is condoned by the sinister sophism that the end, when dealing with known criminals or the "criminal classes," justifies the employment of illegal means. The Supreme Court has responded more or less effectively in curbing illegal search and seizures, illegal detention, and wiretapping by federal officers and "third degree" practices by state as well as federal police officers. It has occasionally been suggested that entrapment is sustainable as a doctrine on the same constitutional grounds as the search and seizure and the confession cases. It has been held, however, that the law forbidding conviction by entrapment methods has no affinity with legal questions concerning the admissibility of testimony for no "constitutional right of the accused has been violated; and the question is,

not as to the admissibility of evidence, but as to the validity of an asserted defense to crime."

Donnelly, *supra*, 60 Yale L.Rev. at 1111 (quoting *Sorrells v. United States*, 57 F.2d 973, 978 (4th Cir.), *cert. granted* 287 U.S. 584, 53 S.Ct. 19, 77 L.Ed. 511, *rev'd* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932)) (footnotes omitted).

The historical Wyoming test of "creative activity" almost exactly fits the implanting and indoctrinating terminology of both *Sorrells*, 287 U.S. 435, 53 S.Ct. 210 and *Jacobson*, —— U.S. ——, 112 S.Ct. 1535. It is clearly apparent that *even if* the Wyoming Supreme Court is determined to continue from *Janski v. State*, 538 P.2d 271 (Wyo. 1975) to the future with some character of this subjective test, the adaptation provided by the present majority complies neither with prior Wyoming precedent nor with current federal law. In *Com. v. Thompson*, 382 Mass. 379, 416 N.E.2d 497, 500 (1981), that court, another subjective jurisdiction, stated by reference to *Sorrells*, that the defense arises only if the criminal conduct was the product of the " 'creative activity' of the law enforcement officers or agents * * *." *The majority decision in this case clearly does not follow historical Wyoming precedent.*[10]

## IV. HISTORICAL PATHWAY TO THE PRESENT IN WYOMING

The pathway from *Casey*, 276 U.S. at 421, 48 S.Ct. at 375 and *Olmstead*, 277 U.S. at 471, 48 S.Ct. at 570, Brandeis, J., dissenting, through the course of federal cases leading to *Jacobson*, —— U.S. ——, 112 S.Ct. 1535, is too long to detail in this dissent and too well considered in carefully written reviews.[11]

---

**10.** See the discussion of "creative activity" with reference to the use of the terms in both *Sherman*, 356 U.S. at 372, 78 S.Ct. at 821 and *Sorrells*, 287 U.S. at 451, 53 S.Ct. at 216. *See also* Comment, *Criminal Procedure: Entrapment Rationale Employed To Condemn Government's Furnishing of Contraband*, 59 Minn.L.Rev. 444, 451 (1974).

**11.** *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988); *Hampton v.*

*United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Sherman*, 356 U.S. 369, 78 S.Ct. 819; *Rochin*, 342 U.S. 165, 72 S.Ct. 205; *Sorrells*, 287 U.S. 435, 53 S.Ct. 210.

The authoritative text, Marcus, *supra*, provides a well documented history. *See also* Chambers, *supra*, 44 Ark.L.Rev. 493; Senneff, *supra*, 1 U.S.F.L.Rev. 177; Webster, *supra*, 32

**18**

Wyoming case law fails to provide great illumination in either the present majority or previous cases since little consideration was given to philosophical principles, ethical governmental morality, or constitutional concepts involved in entrapment activities by the government. The exception comes in the brief evaluation provided, in a non-definitive decision, by Justice A.G. McClintock in *Lafleur v. State*, 533 P.2d 309, 314 (1975) (emphasis added):

> Without anticipation of what our view might be should a case ever arise wherein the activity of the government has been to manufacture the crime, and conceding that the initial suggestion for the crime did not come from defendant, there is ample evidence from which the jury could conclude that it came from defendant's associate and that defendant himself was at all times an active participant in the investigation, planning (such as it was), and execution of the offense. By its verdict the jury has rejected any claim that this crime was the creation of the State. We therefore hold that whether viewed *subjectively* from the standpoint of the defendant's conduct and intention or *objectively* as to the degree of participation of the State, the defense of entrapment was not established as a matter of law.

In *Higby v. State*, 485 P.2d 380 (Wyo. 1971), an appropriately thoughtful concept was advanced; but, overtly, the concept has not been followed to the present majority opinion. "Entrapment does not arise where one is ready to commit the offense, given but the opportunity, and suspected persons can be tested by being offered an opportunity to transgress the law although they may not be put under any extraordinary temptation or inducement." *Id.* at 384. That concept requires review of the activity of law enforcement and recognizes that an initial suspicion is required before the entrapping process becomes justified. The test advanced in *Montez v. State*, 527 P.2d 1330, 1332 (Wyo.1974) of "govern-

ment's deception actually implants the criminal design in the mind of the defendant," is a more complex statement for the continued concept of *"creative activity"*.

In *Higby*, the entrapment defense had been raised, considered at a pre-trial hearing where denied, and then withdrawn before trial. *Dycus v. State*, 529 P.2d 979 (Wyo.1974) followed the same concept by finding lack of evidence of any *"creative activity"* of the police authority while citing *Sherman*, 356 U.S. at 372, 78 S.Ct. at 821. The Wyoming court then said that if a dispute existed, the dispute would be referred to the jury for a decision as a matter of fact. *Dycus*, 529 P.2d at 981.

The principal case for Wyoming law was *Janski*, 538 P.2d 271, which resulted from a fractious final rehearing split decision with two justices forming the plurality with one concurrence and two justices dissenting. The court adopted the subjective test without differentiation of the prior cases, evaluation of the objective approach, or examination of the structural invalidity in the subjective approach which was then well known. Justice Robert A. Rose, however, in a strongly addressed dissent, recognized that the *"creative activity"* test of *Higby* and *Dycus* was being abandoned. *Janski* was bottomed on an esoteric concept of ready complaisance to prove predisposition. In *Lafleur*, 533 P.2d 309, the court quoted in part *Saunders*, 38 Mich. 218, which had reapplied the "creative activity" test.

*Wright v. State*, 670 P.2d 1090 (Wyo. 1983) involved excessive sentencing questions, *see*, *Wright v. State*, 707 P.2d 153 (Wyo.1985), but casually left for the jury's decision questions of initial predisposition and, for that matter, apparently ignored "creative activity" conceptualization. Neither the initial nor the later *Wright* case really clarified appropriate issues of entrapment, since seemingly not contested among the jurists writing in either opinion.[12]

Ariz.L.Rev. at 614; and Greaney, *supra*, 67 Notre Dame L.Rev. 745.

12. A rehearing was denied in *Wright*, 670 P.2d 1090, and then a writ of certiorari was granted to ameliorate the critiqued excessive sentence.

This court's last experience with entrapment, before today, came in *Noetzelmann v. State*, 721 P.2d 579 (Wyo.1986), which was a typical suspicion situation, confirmed by result, where the entrapment instruction was denied by the trial court. Those facts hardly determined inapplicability of an objective standard or, perchance, adoption of the clear subjective approach since predisposition was not an issue.

In the present case, the evidence when viewed in a light favorable to appellant discloses that the agents went to the Corner Pocket for the express purpose of meeting and attempting to purchase drugs from appellant. A surveillance crew was already in position outside the bar. Upon being introduced to appellant by their informant, the agents asked appellant if he could get them some marijuana. Appellant left the bar and returned 30 minutes later with two baggies of marijuana.

Even when viewed in this light, the evidence is not sufficient to support the theory of entrapment. Entrapment occurs only when the criminal conduct was the product of the *creative activity* of law enforcement officials. \* \* \* It does not arise if one is ready to commit the offense, given but the opportunity. \* \* \* The decisions in cases involving the illegal sale of drugs are practically unanimous in holding that the offense of entrapment is not available where the only solicitation is an offer to buy. \* \* \* Suspected persons can be tested by being offered an opportunity to transgress the law, although they may not be put under an extraordinary temptation or inducement.

*Id.* at 581 (emphasis added). *See, e.g., People v. Kulwin*, 229 Ill.App.3d 36, 170 Ill. Dec. 828, 593 N.E.2d 717 (1992), where inducement is the test as synonymous with creative activity which was previously used in Wyoming.

It is valuable to recognize, although postured more upon an objective analysis, the

historical Wyoming tenet of *"creative activity"*, *Dycus*, 529 P.2d 979; *Higby*, 485 P.2d 380; *cf. Lafleur*, 533 P.2d 309, adopted neither objective nor subjective approaches. In essence, I recognize the "creative activity" concept to be closely identified with "reasonable suspicion."

## V. THE INFIRMITIES OF THE MAJORITY ANALYSIS

The instruction actually given by the trial court in this case intentionally deleted the concept of *"creative activity"* which had been developed in *Dycus, Higby*, and *Lafleur*. References in the majority opinion to *Janski*, 538 P.2d 271, and the law journal article, W. Michael Kleppinger, Note, *Criminal Procedure—The Entrapment Defense—The Determination of Predisposition. Janski v. State*, 538 P.2d 271 (Wyo.1975), 11 Land & Water L.Rev. 265 (1976), fair no better in adaptation to Wyoming precedent. In the first place, there is abject confusion in words. In two early federal cases, *United States v. Becker*, 62 F.2d 1007, 1008 (2nd Cir.1933) and *United States v. Sherman*, 200 F.2d 880, 881 (2nd Cir.1952), Judge L. Hand used the word "complaisance" for a measured test of predisposition, "willingness \* \* \* as evinced by ready complaisance." Justice Raper, in writing the rehearing decision in *Janski*, 538 P.2d 271, used the same word. Justice McClintock, in the special concurrence which made the majority decision, used the words "ready compliance," and Justice Rose used "complaisance" for the rejected test in dissent. Kleppinger in his article finds the adapted test to be emplaced in "compliance."

Obviously, the two words communicate an entirely different meaning, although both are nouns and both look similar in spelling. The real differentiation, which is significant in addressing the entrapment conflict about predisposition, is that "complaisance" describes an attitude, e.g. affability, as a synonym, while "compliance"

It would have been easier to recognize that the victim in the first case was the entrapped defendant who did a favor in return for the ride he had been provided. The *"creative activity"* was

totally in the conduct of the undercover narcotics agent who picked up the defendant while he was hitchhiking home.

describes an act. "Compliance" might tend to show "complaisance," but it could also show fraud, duress, or threat reaction, or, for that matter, other states of the mind that determined that character of action. "Complaisance" is a "why" word and "compliance" is a "what" word. This is significant because complaisance may be, in reality, an explanation for predisposition, while compliance only would prove it happened because it happened and not why.

It should be noted, however, that Kleppinger did recognize that the language of *Janski*, whether complaisance as was used, or compliance as he discusses, represents a fundamental departure from the traditional concepts of a sufficient showing of predisposition in the entrapment. The author continues to accurately recognize:

> With a shift away from an inquiry into genesis of intent the creative activity doctrine is largely emasculated. The creative activity doctrine has generally been invoked to prohibit prosecutions where the criminal design originated with the police and the criminal activity was essentially due to the creative efforts of the law enforcement officials. Prohibition of "manufactured crimes" is founded on the obvious policy that justice is not served when law enforcement officials are allowed to, in effect, create crimes for the sole purpose of prosecuting them. However, under the *Janski* ruling the inquiry is not one into where the criminal design itself originated, but is only directed at what occurred after the undercover solicitation. The net effect of the ruling is to shift the inquiry in the entrapment defense from the question of where the creative impetus of the activity was lodged to the question of the defendant's reaction to undercover solicitation.

Kleppinger, *supra*, 11 Land & Water L.Rev. at 273 (footnotes omitted).

The author then provides a further conclusion which I find appropriately recognizes the logic and realism of this subject:

> The *Janski* ruling, then, is a potentially radical departure from traditional foundations of the entrapment defense.
> * * *

\* \* \* \* \* \*

The doctrine announced by the Wyoming Supreme Court in *Janski v. State* represents a fundamental departure from the traditional concepts of a sufficient showing of predisposition in the entrapment defense. Although the requirement that predisposition be shown in terms of where the criminal design originated has not been completely abandoned in *Janski*, the ruling opens a new avenue by which the state can rebut the defense of entrapment and more easily create a jury issue of entrapment. Under *Janski*, ready compliance is not founded solely in the genesis of intent inquiry, the hallmark of the defense since its inception. Recognition of a showing of ready compliance to undercover solicitation as sufficient to establish predisposition and send the issue of entrapment to the jury narrowly limits the evidentiary inquiry as to the issue of predisposition. The potential effect of the *Janski* doctrine's departure from the genesis of intent inquiry is to limit radically the viability of the entrapment defense in Wyoming.

Kleppinger, *supra*, 11 Land & Water L.Rev. at 274–76 (footnotes omitted).

The particular significance of Wyoming's limitation on the entrapment defense results from the failure of the majority in this case to carefully read *Jacobson*, —— U.S. ——, 112 S.Ct. 1535; to review the historical Wyoming law; and, to consider the current movement of many of the court systems of this nation.[13] With a proper test if it is complaisance at the required initial contact by law enforcement will not

---

**13.** The majority's abrupt dismissal of *Jacobson* as "not of constitutional dimension," discloses a result-oriented quandary. In one case, the majority seeks the protective umbrella of United States Supreme Court precedent despite the specific protection accorded by the Wyoming Constitution. In the present case, the majority eschews current United States Supreme Court precedent to favor a restrictive view of former precedent. There must be a better explanation of this form of rationality because in both cases, the majority upheld the conviction.

suffice to provide proof at the time of first solicitation to actually commit a crime. Ultimate compliance proves only occurrence which is, obviously, a given in an entrapment related prosecution. The fact that the crime occurred in this context proves next to nothing regarding the question of predisposition or invited solicitation as conflicting concerns regarding the creative activity environment. *See Jimenez v. State,* 838 S.W.2d 661, 667 (Tex.App.1992), discussing origination of the criminal design, e.g. governmental officials and their agents or in the mind of the defendant. "Creative activity" and origination of the criminal design are near synonymous terms and identical concepts.

One of the best illustrations and analyses found is in the New York case of *People v. Isaacson,* 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978), in a jurisdiction which followed the subjective test, but applied a thoughtful due process outrageous conduct examination. In examining these concerns, in our present context, it has to be continually recalled that no particular drug activity existed in Jackson until law enforcement decided to initiate the sting campaign. With that fact in mind, the *Isaacson* court consideration is fruitful:

Illustrative of factors to be considered are: (1) whether the police manufactured a crime which otherwise would not likely have occurred, or merely involved themselves in an ongoing criminal activity (compare *Greene v. United States,* 9 Cir., 454 F.2d 783, with *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, *supra* ); (2) whether the police themselves engaged in criminal o[r] improper conduct repugnant to a sense of justice (see *United States v. Archer,* 486 F.2d 670, *supra;* cf. *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, *supra* ); (3) whether the defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness (See Schecter, Police Procedure and the Accusatorial Principal, 3 Crim.L.Bull. 521, 527); and (4) whether the record reveals simply a desire to obtain a conviction with no reading that the police motive is to prevent further crime or protect the populace. No one of these submitted factors is in itself determinative but each should be viewed in combination with all pertinent aspects and in the context of proper law enforcement objectives—the prevention of crime and the apprehension of violators, rather than the encouragement of and participation in sheer lawlessness. As a bare minimum, there should be a purposeful eschewal of illegality or egregious foul play. A prosecution conceived in or nurtured by such conduct, as exemplified in these guidelines, so as to cast aside and mock "that fundamental fairness essential to the very concept of justice" should be forbidden under traditional due process principles.

*Isaacson,* 406 N.Y.S.2d at 719, 378 N.E.2d at 83.

It is not inopportune to recognize here that a "but for" rule has logical validity. "But for" the introduction of the police of drugs available for cheap sale, there would have been no criminal activity. Consequently, no conviction opportunity would exist.

The fact that the allegedly entrapped offenses did occur only proves that much and not what prior intent existed in the mind of Rivera regarding more than his interest in a product for personal use. We have one of the tenth grade fundamental fallacies of logic where we say the fact that it happened (what) does not prove *why,* e.g., predisposition. Obviously, when Wright got into the narcotic agent's car while hitchhiking home, he had no predisposition to make a gift of his stash, and particularly so to a stranger. His affability was tested when the entrapment effort was started by his car ride host. *Wright,* 670 P.2d 1090.

The real significance of Wyoming case law is that the well-defined test of "creative activity" regularly followed before and somehow lost in the 2–1–2 decision of *Janski,* was *intentionally rejected over objection for its use in the instructions in this case.*

Consequently, I can state forcefully that Wyoming historical precedent cannot be used to justify the most confined possible instruction given in appellant's disfavor here. In essence, the instruction was a "directed verdict" on the issue of guilt in the event that the appellant had the temerity to raise an entrapment issue. In this case, no matter how outrageous the conduct, the jury was essentially directed to find compliance to the offer, for any entrapment defense, was adequate proof to reject entrapment. Rivera bought, so, he was not entrapped. The test stated, not bottomed on historical Wyoming concepts, provided little validity but great damage in usage. That fact is also illustrated by the court's decision to "let everything in that the drug addict informer might say about past experiences with appellant." Any limitation, if there was any, of the W.R.E. 404(b) was thrown out the window and Rivera was convicted by what Compton, with a twenty-eight year career in drug peddling, might state in testimony.

The concept of "creative activity" generally applied in Wyoming cases can be traced to the *very first* federal entrapment decision. *Woo Wai*, 223 F. 412. The "creative activity" in that case was there, as here, initiation by the government to secure commission of the crime in order to then prosecute. " 'No state, therefore, can safely adopt a policy by which crime is to be artificially propagated.' " *Id.* at 415 (quoting *Com. v. Bickings*, 12 Pa.Dist.R. 206).

As a demonstration of how legally outrageous the denial to Rivera of the terms "creative activity" really was, we need only to look to one of the strongest subjective test state jurisdictions, Illinois. The subjective test is defined and explained in *People v. Spahr*, 56 Ill.App.3d 434, 14 Ill.Dec. 208, 211, 371 N.E.2d 1261, 1264 (1978):

Under that test, there are two questions which must be answered when determining if entrapment is present: (1) whether the defendant was induced to commit a criminal offense by a government official or his agent; and (2) whether the defendant was predisposed to commit the type of offense with which he is charged. In

order for entrapment to be present, the criminal conduct must be the product of the creative activity of a law enforcement official.

*See also People v. Walker*, 61 Ill.App.3d 4, 18 Ill.Dec. 315, 316, 377 N.E.2d 604, 605 (1978), which states:

The Illinois rule is that entrapment is established where narcotics are supplied to the defendant by the government's paid informant. * * * Furthermore, it has been held that the defense of entrapment is established where there is unrebutted testimony by defendant that the State's informant supplied the drugs that are the subject of the offense.

*Thompson*, 416 N.E.2d at 500 (quoting *Sorrells*, 287 U.S. at 451, 53 S.Ct. at 216) states: "The defense arises only if the criminal conduct was the product of the 'creative activity' of law enforcement officers or agents[.]"

This comparison, from the course of the Wyoming rule development on entrapment, demonstrates that the present decision is not led or driven by previously well established precedent. Rather, the majority now adopts an outdated thesis without even recognizing the persistently required review of police officer conduct, which is clearly central in *Jacobson*, the most recent United States Supreme Court decision. I perceive that we take a direction for Wyoming law which is clearly contrary to logic, fairness and the general trend of theory development.

## VI. WHY NOT THE SUBJECTIVE TEST?

The defects in the subjective entrapment approach have been discussed in dissents of the greatest jurists of this century and by innumerable commentators and scholars, as well as by the trend in understanding of enlightened state judiciaries. The lack of balance and fairness in the thesis is observable by the due process governmental outrageous conduct palliative which may salve the judicial conscience, but provides no actual change in result.

The first infirmity of the subjective defense structure for entrapment is that it controls or supervises neither outrageous conduct nor the crime making efforts of law enforcement, and certainly does not provide an adequate remonstration for the anything goes "Rambo" conduct. The second broadly understood difficulty in operation of the subjective approach is the transference of the jury guilt determining function further into bad acts and reputation instead of evidence of guilt of the present crime. Great danger exists in the use by a defendant of the entrapment defense because it creates an open season for the prosecution to prove overtly a predisposition and subjective guilt by past history and bad character of the individual's reputation.

As a result, knowledgeable defense counsel and text writers recognize what they give up to assert entrapment in a subjective doctrine jurisdiction may be far too dangerous to justify the use of the defense. If we think, as I do, *Wehr v. State*, 841 P.2d 104 (Wyo.1992), Urbigkit, J., dissenting, that we have converted our law from fact of guilt determination to reputation and character through W.R.E. 404(b) utilization, the gate becomes completely opened, if entrapment is introduced, to further justify extensive expansion of prosecution by admission of testimony regarding reputation and character. Professor Roger Park in his analysis, Roger Park, *The Entrapment Controversy*, 60 Minn.L.Rev. 163, 272 (1976), recognized:

> The greatest fault of federal entrapment doctrine lies in the permissiveness of its ancillary rules of evidence. Suspicion, rumor, second-hand reputation evidence, and other testimony which would normally be barred by the hearsay rule has been welcomed by some courts. This indiscriminate attitude toward predisposition evidence is by no means a necessary feature of the subjective test.

In even more detail, Michael Senneff, writing regarding entrapment in the federal courts, Michael Senneff, *Entrapment in the Federal Courts*, 1 U.S.F.L.Rev. 177, 180–81 (1966) (quoting *Sherman*, 356 U.S. at 383, 78 S.Ct. at 826 and *Sorrells*, 287 U.S. at 459, 53 S.Ct. at 219) (footnotes omitted), concluded:

> In entrapment, we see that evidence inadmissible on the question of guilt is submitted to the jury on the question of entrapment. The danger here is twofold. Not only may the jury be prejudiced by the evidence admissible in rebuttal, but it may well confuse the issues of the defendant's commission of the act with that of his entrapment. The fact that the defendant committed the act may infect the jury's findings on the question of whether he was entrapped into its commission. In following the rationale of *Jackson v. Denno*, the question of "origin of intent" is properly a matter for the court's determination. A finding on the question of entrapment, independent from that on the guilt of the defendant, is within the province of the court.

> Further difficulties, however, are encountered with this "origin of intent" test which should lead to its abandonment. This theory makes the controlling factor the predisposition of the defendant. The rationale justifying the admission of rebuttal evidence is that since the defendant was the one who interjected the issue of entrapment, he cannot complain of an inquiry into his own conduct. If the defendant elects to avail himself of the defense, he must allow the prejudicial evidence to be admitted against him. The objection here is that it is unfair to prejudice a defendant for availing himself of a valid defense.

> Admission of evidence on predisposition tends to divert the issue from the guilt of the defendant for the particular offense to that of the nature of his prior conduct. A defendant has a right to be tried on the particular offense charged. In almost every instance where the defense of entrapment is interposed, however, the intent that this particular offense be committed at this particular time originated with the Government agent.

> The danger is that the individual's prior conduct will determine his conviction or acquittal in this particular case. One

defendant may be convicted because his prior record and reputation were found to justify the police conduct, while another defendant may be acquitted because his lack of such prior conduct caused the same activity to be entrapment. Mr. Justice Frankfurter recognizes this possibility, saying that:

> "Permissible police activity does not vary according to this particular defendant concerned; surely if two suspects have been solicited at the same time in the same manner, one should not go to jail simply because he has been convicted before and is said to have a criminal disposition."

The danger inherent is "to say that such conduct by an official of Government is condoned and rendered innocuous by the fact that the defendant had a bad reputation or had previously transgressed." The tendency to make the prior activities of the defendant controlling on the question of his guilt in this particular case, is even more apparent when the matter is submitted to the jury.

Professor Ben A. Hardy, writing in his article, *The Traps of Entrapment*, 3 Am. J.Crim.L. 165, 165 (1974), was even more pragmatic:

> A great deal of confusion and misunderstanding seems to exist with regard to the defense of entrapment and its use. The general public and inexperienced members of the bar frequently express the view that, whenever a police officer or his agent solicits the illegal sale of drugs or contraband, the defense of entrapment is automatically applicable to the case and, in all probability, will relieve the defendant of criminal responsibility. This article proposes to dispel the mistaken belief that the entrapment defense is a panacea in such situations. Entrapment is a highly dangerous and judicially unpopular defense that should only be used in a few cases with ideal fact situations or in desperate circumstances where no other defense is possible and plea bargaining has proven unsuccessful. The defense is a limited one which must be approached cautiously

and which, of course, should be fully explained to one's client.

Philosophically, I have an even more severe condemnation of what is occurring and what is justified in the subjective entrapment defense. Since the concept is emplaced within the "anything goes" ends and means dialogue, criminality of the society is promoted in the guise of correction and protection, but even worse than that, *the judiciary becomes, in result, a cynical co-conspirator in the promotion and justification of legitimatizing criminality* of those seeking to do good by doing bad. Whether it is selling or providing liquor to minors and assisting in property invasion felonies, or bringing controlled substances into a society to create buyers, both law enforcement and the judiciary depart with dirty hands.

We all should read with care the law journal description of Professor Laura Gardner Webster as she recounts her experiences as a litigator during the ABSCAM trials where she initially pursued her vision of justice. She concluded:

> Society may not care about the collateral victims of a deceptive government, but I think it is because society does not see them. For myself, it is not the unfairness of the results, the possibility that some people got more than they deserved, or that I learned to try a case while others learned to hand out money that angers me. It is that, in a matter of grave importance to me, I was lied to. As Sissela Bok observes:
>
> > "Bias skews all judgment, but never more so than in the search for good reasons to deceive. Not only does it combine with ignorance and uncertainty so that liars are apt to overestimate their own good will, high motives, and chances to escape detection; it leads also to overconfidence in their own imperviousness to the personal entanglements, worries, and loss of integrity which might so easily beset them."
>
> Despite the loss of my illusions, I knew even then that an institution which compromises the very integrity it seeks to

enforce and upon which it is premised, has lost far more than I did.

Webster, 32 Ariz.L.Rev. at 644 (quoting 5 S. Bok, *Lying: Moral Choice in Public and Private Life* 26 (1978)).

## VII. WHERE IS THE LAW GOING?

We should look further at the logic and the recognition of the need to preserve a basic integrity for the judiciary which was central to *Cruz,* 465 So.2d 516, and most recently emplaced in *Krajewski v. State,* 597 So.2d 814 (Fla.App.1992), *remand State v. Krajewski,* 589 So.2d 254 (Fla. 1991). Florida, in essence, derives its law by an essential recognition of the adjudicatory philosophic and logical mastery of Justice Frankfurter, stated in concurrence in *Sherman,* 356 U.S. at 382–83, 78 S.Ct. at 825–26.

"The crucial question, not easy to answer, to which the court must direct itself is whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power....

"... [A] test that looks to the character and predisposition of the defendant rather than the conduct of the police loses sight of the underlying reason for the defense of entrapment. No matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society.... Permissible police activity does not vary according to the particular defendant concerned; surely if two suspects have been solicited at the same time in the same manner, one should not go to jail simply because he has been convicted before and is said to have a criminal disposition. No more does it vary according to the suspicion, reasonable or unreasonable, of the police concerning the defendant's activities. Appeals to sympathy, friendship, the possibility of exorbitant gain, and so forth, can no more be tolerated when directed against a past offender than against an ordinary law-abiding citizen. A contrary view runs afoul of fundamental principles of equality under law, and would espouse the notion that when dealing with the criminal classes anything goes. The possibility that no matter what his past crimes and general disposition the defendant might not have committed the particular crime unless confronted with inordinate inducements, must not be ignored. Past crimes do not forever outlaw the criminal and open him to police practices, aimed at securing his repeated conviction, from which the ordinary citizen is protected."

*Cruz,* 465 So.2d at 520. The Florida court then quoted the New Jersey Supreme Court for that court's substantive leadership, which later, to a degree, was superseded by statute:

We do not foresee a problem in providing two independent methods of protection in entrapment cases. The New Jersey Supreme Court has found that the two tests of entrapment can coexist:

"In articulating [the entrapment doctrine], our Court has adopted two standards respecting entrapment. The traditional or subjective standard defines entrapment as law enforcement conduct which implants in the mind of an innocent person the disposition to commit the alleged crime, and hence induces its commission.... Under this traditional formulation, the defense of entrapment is limited to those defendants who were not predisposed to commit the crime induced by government actions.

"In recent years, however, this Court has fashioned a second, independent standard for assessing entrapment. It recognizes that when official conduct inducing crime is so egregious as to impugn the integrity of a court that permits a conviction, the predisposition of the defendant becomes irrelevant.... This Court recently explained in *Talbot* [*State v. Talbot,* 71 N.J. 160, 167–68, 364 A.2d 9, 13 (1976)]:

'[A]s the part played by the State in the criminal activity increases, the importance of the factor of defendant's criminal intent decreases, until finally a point may be reached where the methods [employed] by the state to obtain a conviction cannot be countenanced, even though a defendant's predisposition is shown. Whether the police activity has overstepped the bounds of permissible conduct is a question to be decided by the trial court rather than the jury.' "

*State v. Molnar,* 81 N.J. 475, 484, 410 A.2d 37, 41 (1980).

*Cruz,* 465 So.2d at 521. Sequentially, the Florida process having found that the objective and subjective doctrines could coexist, first, examined the police conduct as a matter of law. The test is

to require the state to establish initially whether "police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." *Sherman,* 356 U.S. at 382, 78 S.Ct. at 825 (Frankfurter, J., concurring in the result). Once the state has established the validity of the police activity, the question remains whether "the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells,* 287 U.S. at 442, 53 S.Ct. at 212 (1932). This question is answered by deciding whether the defendant was predisposed, and is properly for the jury to decide. In other words, the court must first decide whether the police have cast their nets in permissible waters, and, if so, the jury must decide whether the particular defendant was one of the guilty the police may permissibly ensnare.

*Cruz,* 465 So.2d at 521–22.

To reach a decision, a two subject threshold test is applied:

(a) Interruption of a specific ongoing criminal activity; and

(b) Utilize means reasonably tailored to apprehend those involved in the ongoing criminal activity. *Cruz,* 465 So.2d at 522.

The *Cruz* court did not get to the subjective jury issue when resolution was made on the inappropriateness of the drunken bum routine used for the sting operation. The undercover agent acted like a passed out drunken bum with money hanging out of his pockets, which constituted entrapment.

The more recent case of *Krajewski,* 597 So.2d 814, following remand by the state in the earlier opinion of *Krajewski v. State,* 587 So.2d 1175 (Fla.App.1991), addressed the test of *Cruz,* where the judge found against the defendant on the objective test and the jury was sufficiently unconvinced about existing predisposition to acquit. Other Florida cases providing substance to this approach include: *State v. Hunter,* 586 So.2d 319 (Fla.1991) (the state agent attempted a fee for service solicitation of the targeted individual to become implicated in drug transactions which was found to constitute entrapment as a matter of law) and *Beattie v. State,* 595 So.2d 249 (Fla.App. 1992) (involving the question of the interruption of an ongoing criminal activity to be factually the issue for the prosecution to escape from an entrapment). When the activity started with the sting operation to purchase a videotape, the test requirement failed and the conviction was reversed. That police activity violated the test of "virtue testing," which is defined in the case as police activity seeking to prosecute crime where no crime exists but for the police activity engendering the crime. Lack of known involvement in an ongoing criminal activity also required reversal on an entrapment objective test violation. *Morales v. State,* 594 So.2d 343 (Fla.App. 1992). *Cf. State v. Valdes,* 599 So.2d 1046 (Fla.App.1992), where a factual issue existed precluding a motion to dismiss the information and requiring a fact finding trial determination which was in the case consideration of the objective test of the entrapment to be determined by the trial court under the *Cruz* rule.

Florida followed case law developments in New Jersey, which had originated the combination approach, and was then authenticated in New Jersey statutes to " 'a single statutory defense' that intertwined the two conventional strands of common-law entrapment." *State v. Johnson,* 127 N.J. 458, 606 A.2d 315, 319 (1992). *See also* Sean M. Foxe, Survey, *Criminal Law—Entrapment—New Jersey Criminal Code Modifies Entrapment Defense— State v. Rockholt,* 96 N.J. 570, 476 A.2d 1236 (1984), 15 Seton Hall L.Rev. 464 (1985) and Michael A. Gill, *The Entrapment Defense In New Jersey: A Call For Reform,* 21 Rutgers L.J. 419 (1990), which were cited in the *Johnson* decision as hybrid case authorities, and the cases of *Baird v. State,* 440 N.E.2d 1143 (Ind.App.1982), *vacated* 446 N.E.2d 342 (Ind.1983) and *Isaacson,* 406 N.Y.S.2d 714, 378 N.E.2d 78.

*Johnson,* 606 A.2d at 321 decisively recognized:

Entrapment implicates concerns that have always been central to due process. Both share a concern over the "proper use of government power." *Sherman, supra,* 356 U.S. at 382, 78 S.Ct. at 825, 2 L.Ed.2d at 856. Both doctrines require that government adhere to its proper role and not abuse lawful power. *Sorrells v. United States,* 287 U.S. 435, 444, 53 S.Ct. 210, 213, 77 L.Ed. 413, 418 (1932). Wrongful government conduct also arouses the specter that relatively innocent persons may be coerced or seduced into crime. "When the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene." *Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1543, 118 L.Ed.2d 174 (1992); *see Call for Reform, supra,* 21 *Rutgers L.J.* at 440 (defendant is less culpable when enticed into committing crime by government). That concern recognizes that entrapment is not only unfair, it is counterproductive. The creation of crime increases crime, it does not detect or deter it.

The Michigan court, which had first recognized entrapment for any American jurisdiction in *Saunders,* 38 Mich. 218, took a different approach to reach a similar multifaceted result in *People v. Juillet,* 439 Mich. 34, 475 N.W.2d 786 (1991). That court applied an entrapment definition of the conduct that "could induce or instigate the commission of the crime * * *." *Id.* at 792.

In applying the entrapment defense, two tests have emerged across the country. Many states and the federal government use a subjective test, while Michigan and a minority of other states follow the objective test of entrapment. In *Jamieson, supra* [436 Mich. 61, 461 N.W.2d 884 (1990) ], we analyzed both federal and Michigan law and determined that we would continue to follow the objective test, which focuses primarily on the investigative and evidence-gathering procedures used by the governmental agents, rather than the subjective test, which focuses on the defendant's predisposition or motivation to commit a new crime. *Id.* 436 Mich. at 72, 461 N.W.2d 884.

Under a proper approach, factors of both the subjective and objective tests can be considered and utilized to determine if entrapment occurred. *Id.* at 79, 461 N.W.2d 884. Both tests are concerned with "the eradication of convictions that result more from law enforcement invention than from law enforcement detection." *Id.* at 78, 461 N.W.2d 884. The purpose of the entrapment test is to discourage police conduct that manufactures, induces, or instigates the commission of a crime, rather than simply detecting criminal behavior. *[People v.] Turner, supra* 390 Mich. [7] at 20, 210 N.W.2d 336.

*Juillet,* 475 N.W.2d at 792–93.

In essence, the Michigan court retained its objective test attenuated by a causality review. The test questioned whether the entrapment activities would have netted a "normal" person under the same circumstances. Chief Justice Cavanagh stated it differently in his concurrence: (1) unusual circumstances; and (2) mere furnishing of

opportunity without more is not sufficient as addressing concepts of reprehensible conduct. *Id.* 475 N.W.2d at 803. For an excellent analysis, see Susan E. Zale, Note, *People v. Juillet, The Entrapment Test: A Michigan Hybrid,* 1992 Det.C.L.Rev. 933 (1992).

It is apparent that the subjective test fails in the initial missions assigned to it of entrapment control of misconduct, criminality of police officialdom, and maintenance of the moral and ethical stature of the judiciary. Reason and case analysis demonstrate that there is a better way—as initiated by New Jersey and followed in Florida, New Mexico, Michigan, and, perhaps, New York. The intertwined unitary defense characterized by the New Jersey court in *Johnson,* 606 A.2d at 319 can better serve the cause of justice in Wyoming. The extreme position adopted by the majority of this court is reason enough for my dissent. Even better justification is found in trying to direct the future of Wyoming law into a logical and reasoned stature for future justice and certainty.

In a case with similarities to our present Wyoming factual situation, but with far less egregious facts, the conviction was reversed on an entrapment defense in *Kummer,* 481 N.W.2d 437, (N.D.1992). In *Kummer,* one police agent provided the illicit drugs for the accused to sell. This participation established entrapment as a matter of law. *Id.* at 441. The case involved the establishment of the entrapment defense where law enforcement officers furnished the controlled substance that brought about the prosecution and conviction. "When the police themselves violate the law in order to induce a crime, they employ unlawful means." *Id.* at 442. Where the government furnished the drugs, a per se rule of entrapment applies.

The *Kummer* court makes another interesting comment which applies here regarding agents of the government selling controlled substances:

The police tactic of furnishing contraband "lacks the element of *necessity* that has historically been the basis for rationalizing government involvement in the commission of undercover crimes." Comment, *Criminal Procedure: Entrapment Rationale Employed to Condemn Government's Furnishing of Contraband,* 59 Minn.L.Rev. 444, 457 (1974) [Emphasis in original; footnote omitted]. There are sound public policy reasons for adopting a per se rule of entrapment in cases where the police furnish the controlled substance for the crime:

"It seems easy to understand and to explain to police agents, and it seems to give clear guidance about the limits of permissible conduct. Moreover, it seems to strike at a dangerous and unnecessary law enforcement technique. If an agent suspects that a target is dealing in contraband, the agent can attempt to make a decoy purchase from him. There will normally be no need to provide the target with contraband; a person who has been trafficking will have his own sources. Indeed, the fact that an agent found it expedient to provide contraband raises a suspicion that the target was not predisposed.... [T]he rule against furnishing contraband, like the exclusionary rule in search cases, can be seen as a prophylactic rule intended to protect innocent persons from police action intended for the guilty. An agent who feels free to give drugs to targets creates a danger of corrupting the innocent that an agent who merely makes decoy purchases does not."

R. Park, *The Entrapment Controversy,* 60 Minn.L.Rev. 163, 191 (1976) [Footnote omitted].

*Kummer,* 481 N.W.2d at 442–43 (emphasis in original).

Also apropos to this case, that court further recognized:

No criminal liability is imposed by our Uniform Controlled Substances Act "upon any authorized state, county, or municipal officer, engaged in the lawful performance of their duties." * * * Nevertheless, conduct by a public officer is not justified unless it is "required or authorized by law." * * * We are unaware of any statutory authority that

authorizes a controlled substance confiscated in another drug prosecution to be withdrawn from evidentiary retention, offered for sale, and sold to others.

*Id.* at 443.

Comparable authority is provided in *West*, 511 F.2d at 1086 and *Kemp v. State*, 518 So.2d 656 (Miss.1988). For a solicited burglary, the Michigan court applied the same instigation rule in the old but well established case of *People v. McCord*, 76 Mich. 200, 42 N.W. 1106 (1889). For a comparison, see *State v. James*, 484 N.W.2d 799 (Minn.App.1992), where the police officers were only available to sell and did not "manufacture" a crime. *Id.* at 802. *See also United States v. Bueno*, 447 F.2d 903 (5th Cir.1971), *cert. denied* 411 U.S. 949, 93 S.Ct. 1931, 36 L.Ed.2d 411 (1973); *Evans v. State*, 550 P.2d 830 (Alaska 1976); *State v. McKinney*, 108 Ariz. 436, 501 P.2d 378 (1972).

In *People v. Jamieson*, 436 Mich. 61, 461 N.W.2d 884, 900 (1990), which prestaged *Juillet*, 475 N.W.2d 786, Justice Archer, in dissent, provided a list of cases with entrapment or governmental misconduct where the government, as in this case, supplied both the scene and the means by which the crime was committed. Fifteen additional citations from a diverse range of states were listed.

Illinois, although generally a subjective rule state, responded emphatically to *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), and squarely reversed since "[c]learly a conviction for selling a controlled substance or a purported controlled substance cannot be sustained if the substance is supplied by the government." *Spahr*, 14 Ill.Dec. at 212, 371 N.E.2d at 1265 (citing *People v. Strong*, 21 Ill.2d 320, 172 N.E.2d 765 (1961)

and recognizing *contra United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) and *Hampton*, 425 U.S. 484, 96 S.Ct. 1646). Justice Brandeis' dissent in *Olmstead* was quoted with favor by the Illinois court. For early Illinois law, see a similar thesis,although ingrained within a subjective test in *Love v. People*, 160 Ill. 501, 43 N.E. 710 (1896), where a burglary was the product of the creative instigation by the undercover police agent. *See also Walker*, 18 Ill.Dec. 315, 377 N.E.2d 604.

New Jersey case law is in agreement. *See State v. Branam*, 161 N.J.Super. 53, 390 A.2d 1186, 1189 (1978), *aff'd.* 79 N.J. 301, 399 A.2d 299 (1979), in quoting from the principle New Jersey case of *State v. Talbot*, 71 N.J. 160, 168, 364 A.2d 9, 13 (1976):

> "We hold that where an informer or other agent generally acting in concert with law enforcement authorities, furnishes a defendant with heroin for the purpose of then arranging a sale of the heroin by the defendant to an undercover officer, which sale is then consummated, defendant has been entrapped as a matter of law even though predisposition to commit the crime may appear, and notwithstanding that the furnishing of the heroin is unknown to and contrary to the instructions of the law enforcement authorities. Those authorities, having set the agent to work in enticing the defendant, the prosecution should bear the onus of the means selected by the agent."

A casual review of even the most recent cases demonstrates a state court trend toward the objective or the totality of the circumstances entrapment definition.[14] Ex-

---

**14.** Within the literature, and in part because of the unitary application of the subjective test by the federal courts for federal cases, the subjective rule is characterized as the majority rule and the objective rule as the minority rule. A trend away from the subjective rule is apparent within state courts. The characterization for the state courts of majority/minority has continued from a validity created by repetition and no clear delineation is found within the literature. In colloquial terms, it is fair to say that the legend has validity in re-expression and no-

body has stopped to count the rabbits. A fairly recent law journal lists thirteen states which have adopted the objective standard by either or both statute or case law. Chambers, *supra*, 44 Ark.L.Rev. at 502 n. 56. States listed in that summary include: Alaska, Arkansas, Colorado, Florida, Hawaii, Iowa, Kansas, Michigan, New Hampshire, New Jersey, New Mexico, New York, Pennsylvania, Texas, Utah and Vermont. Other states which could be added would include: California, *People v. Barraza*, 23 Cal.3d

actly how the most recent United States Supreme Court case, *Jacobson*, — U.S. —, 112 S.Ct. 1535, or, for that matter, election of a new national president who will appoint additional justices to that court, will affect the analysis of the entrapment defense is far from clear, except that the five to four adaptation vote did continue for the time being. *See* 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 5.2(c) (1986) (footnote omitted), where it is said:

> **(c) The Objective Approach.** Howeverer, there is growing support for the objective approach, variously described as the "hypothetical person" approach or the Roberts–Frankfurter approach (after the writers of the concurring opinions in *Sorrells* and *Sherman*). The objective approach is favored by a majority of the commentators, and is reflected in the formulation of the entrapment defense appearing in the American Law Institute's Model Penal Code.

It is apparent that entrapment and sting activities have progressed nearly a world away from the 1925 case of *State v. Kirkbride*, 34 Wyo. 98, 241 P. 709 (1925), where the inciting activity of the police authority provided the only solicitation [of] an offer to buy.

## VIII. TESTING PREDISPOSITION ALONE IS AN INVALID APPROACH TO THE ENTRAPMENT DEFENSE—LET'S LOOK BOTH WAYS

I dissent in this case in the belief that the creation of the entire environment for a crime to be consequently committed, as in this case a "reverse sting," requires at least judicial examination of the objective (character of police conduct) test of entrapment. *Kummer*, 481 N.W.2d 437. I find the majority here, and these subjective test cases in general, hopelessly confused and unnecessarily complicated. We should step back and relate to a test that examines the entire situation. Consequently, I favor an approach that offers the analysis afforded by Florida and New Mexico and which considers: what the police did; what the defendant did in response; and determines whether entrapment existed as a viable defense or, more properly, exoneration. Generally, this approach is also the course pursued by the Michigan Supreme Court in *Juillet*, 475 N.W.2d 786. *See* Zale, *supra*, 1992 Det.C.L.Rev. 933.

The test of predisposition of the accused to break the law must be independent and not the product of activities of law enforcement. *Jacobson*, — U.S. at —, 112 S.Ct. at 1541. Furthermore, as *Jacobson* determined, in a black letter decision on the most highly contested case between majority and dissent: "Indeed, the proposition that the accused must be predisposed prior to contact with law enforcement officers is so firmly established that the Government conceded the point at oral argument[.]" *Jacobson*, at —, n. 2, 112 S.Ct. at 1541, n. 2. Justice White, in the same footnote in the majority opinion, reaffirmed what he found stated fifty-one years earlier in *Sorrells*. The minority concept would test predisposition not upon initial contact, but only when the government actually suggests commission of the specific crime. The minority permits education by the state to create predisposition to defeat any entrapment defense. See Justice O'Connor's dissent in *Jacobson*, at —, 112 S.Ct. at 1544. An interesting and persuasive critique of

675, 153 Cal.Rptr. 459, 591 P.2d 947 (1979); North Dakota, *Kummer*, 481 N.W.2d 437; Mississippi, *Sylar v. State*, 340 So.2d 10 (Miss.1976); and Indiana, *Baird v. State*, 446 N.E.2d 342 (Ind.1983). Of this group, at least three would constitute hybrid states: New Jersey, *Talbot*, 364 A.2d 9; Indiana, *Baird*, 446 N.E.2d 342; and Florida, *Krajewski*, 587 So.2d 1175.

No count has been provided by any current authority or case revealing a list of states which actually continue to use the subjective test. In current review, those states number fewer than the states where a clear directive by case or statute for the objective test is found. *See, e.g., People v. Colano*, 231 Ill.App.3d 345, 172 Ill.Dec. 916, 596 N.E.2d 195 (1992); *Farris v. Com.*, 836 S.W.2d 451 (Ky.App.1992); *Wilkey v. State*, 203 Ga.App. 1, 416 S.E.2d 350 (1992); *James*, 484 N.W.2d 799; *State v. Grilli*, 304 Minn. 80, 230 N.W.2d 445 (1975); *Strong v. State*, 591 N.E.2d 1048 (Ind.App.1992); *State v. Tate*, 593 So.2d 864 (La.App.1992); and *State v. King*, 17 Kan. App.2d 349, 838 P.2d 349 (1992).

*Jacobson* is currently provided by Maureen Duffy in Note, *Jacobson v. United States: Do The Ends Justify The Means In Government Stings?*, 24 Loy.U.Chi.L.J. 77, 107 (1992):

> The Court reached a just decision when it reversed Jacobson's conviction. Unfortunately, its silence on the issue of appropriate government conduct may suggest to investigators that the ends will continue to justify the means in sting operations. As long as the government can demonstrate later that the defendant had a guilty state of mind, there is no apparent check on its activities. Until the Court establishes some reasonable limits, Big Brother will remain alive and well.

In support and substantiation, note should be taken of the analysis provided eleven years earlier by Ted K. Yasuda, Note, *Entrapment as a Due Process Defense: Developments After Hampton v. United States*, 57 Ind.L.J. 89, 129–30 (1982) (emphasis in original), where he concluded with a message obviously heard by what today may be a majority of state courts:

> The extensive government aiding and solicitation of crimes disclosed in recent cases demonstrate the inadequacy of existing theories of entrapment. Although insisting that the defense of entrapment is narrowly based upon a statutory exception for the nonpredisposed, the Supreme Court has repeatedly acknowledged in dicta that due process may also set limits to government involvement in crime. The lower federal courts in turn have recognized a due process defense which would supplement the otherwise statutory defense of entrapment. The result, however, has been far from satisfactory. The federal courts have failed to formulate the constitutional basis for their insight that the avowedly statutory test for entrapment should not be exclusively controlling. The Supreme Court's reference to conduct that "shocks the conscience" has been deficient as a basis on which to develop standards for safeguarding due process in the entrapment context: subjective assessments of "outrageousness" have largely been the order of the day. Moreover, the resulting mixture—a statutory defense which must be supplemented, due to its own shortcomings, by a vague constitutional mandate prohibiting "outrageous" government undercover activity—is unwieldy and internally inconsistent. It is left unexplained why part of the entrapment defense is of constitutional dimension, while another part is not, as if successfully inducing criminal conduct on the part of those not originally ready and willing to commit crime were somehow not outrageous.
>
> A more unitary theory of entrapment governed by a more objective inquiry is needed. Entrapment should be squarely founded on the principle that the manufacturing of crime serves no legitimate purpose, and that where crime is manufactured, prosecution must be barred as a matter of due process. The inquiry relevant for the defense should simply be whether the government's conduct has led the defendant to commit a crime which he otherwise would not have committed. Predisposition *is* relevant: a person not already predisposed to commit a crime is not likely to do so independently, and there can be no legitimate reason to overcome such an individual's reluctance to engage in crime. The presence of predisposition should not be dispositive, however. A bare predisposition to commit an act does not establish that the defendant would have acted in the real world as he did under the artificial circumstances provided by the government's actions. Predisposition, if established, should be only one of several factors to determine whether a crime has been manufactured, the artificiality of the government's aid and encouragement, and the likelihood that a third party would have played the role acted by the government being at least equally relevant. Such an approach avoids the inadequacies of the predisposition test for entrapment, as well as the subjectivity inherent in appraisals of "outrageousness." An entrapment defense must ask the right question in order to safeguard adequately the right to be free from gov-

ernment conduct which creates, rather than detects, crime.

It is my conclusion that no rational, practical or fair minded adaptation for entrapment can be developed by solely considering the defendant's intent without considering the acts of instigation made by officers of the law to arrange for a crime to occur so that arrest can be made.

It appears doubtful that either the subjective or objective approach could be structured in such a way that it alone would provide a rational and fair defense. The best approach would be one that incorporates both tests with some modifications—that is, one that first would allow the defendant to raise the defense by a pretrial motion in which the propriety of the police conduct is challenged as creating too great a risk of inducing an innocent man to commit a crime. At this stage also, the government should be required to show that it had probable cause for singling out the defendant for affirmative action. This should be judged on the basis of what was known at the time of such action. Even if a challenge under the objective test is not raised, the defendant should be entitled to a pretrial hearing in which the government is required to show probable cause for its actions with regard to the defendant. These decisions should be for the court alone. If the defendant loses at these preliminary stages, he should then be allowed to raise the defense at trial under the subjective test. His burden should be as light as possible, and he should be required to show no more than government involvement in order to raise the issue. Once the defendant has raised the issue, then the burden should be on the prosecution to prove no entrapment beyond a reasonable doubt, and this should be the only issue submitted to the jury concerning entrapment.

Hardy, *supra*, 3 Am.J.Crim.L. at 203.

The real issue considers who created the environment for the criminal act within the totality of the circumstances. What I propose, as provided in *Juillet*, 475 N.W.2d

786, and the course of Florida cases starting with *Cruz*, 465 So.2d 516, is a reexamination of the totality of the circumstances. The goal is to apprehend the criminal, and even prevent criminal conduct, and not to be the principal through which its commission is arranged and pursued. This thesis is not only consistent with the most recent majority of the United States Supreme Court in *Jacobson* —— U.S. ——, 112 S.Ct. 1535, but follows reliably from *Sherman*, 356 U.S. 369, 78 S.Ct. 819, and, in this state, *Lafleur*, 533 P.2d at 310. I find no office in the entrapment defense analysis for a separate consideration of outrageous governmental conduct. It is, as the majority essentially concluded in *Jacobson*, that outrageous conduct is an attendant function and factor in any attempted application of the subjective entrapment defense.

One of the greatest state jurists of this century, Justice Stanley Mosk of the California Supreme Court, addressed this subject in the detailed case of *People v. Barraza*, 23 Cal.3d 675, 153 Cal.Rptr. 459, 591 P.2d 947 (1979). In his broad analysis of the current status of the law he recognized:

Such support for the [objective test] no doubt derives from a developing awareness that "entrapment is a facet of a broader problem. Along with illegal search and seizures, wiretapping, false arrest, illegal detention and the third degree, it is a type of lawless law enforcement. They all spring from common motivations. Each is a substitute for skillful and scientific investigation. Each is condoned by the sinister sophism that the end, when dealing with known criminals or the 'criminal classes,' justifies the employment of illegal means." (Donnelly, *Judicial Control of Informants, Spies, Stool Pigeons, and Agent Provocateurs* (1951) 60 Yale L.J. 1091, 1111.)

*Barraza*, 153 Cal.Rptr. at 467, 591 P.2d at 955.

Following a review of the complete literature found in the United States Supreme Court cases of *Sorrells*, 287 U.S. 435, 53 S.Ct. 210; *Sherman*, 356 U.S. 369, 78 S.Ct. 819; and *Russell*, 411 U.S. 423, 93 S.Ct.

1637, and the historical California law, Justice Mosk concluded, with the weight of reason provided by Chief Justice Warren in *Sherman*, 356 U.S. at 372, 78 S.Ct. at 820–21, "the function of law enforcement manifestly 'does not include the manufacturing of crime.'" *Barraza*, 153 Cal.Rptr. at 466, 591 P.2d at 954. Justice Mosk additionally concluded:

> Commentators on the subject have overwhelmingly favored judicial decision of the issue by application of a test which looks only to the nature and extent of police activity in the criminal enterprise. (See, e.g., LaFave & Scott, *Handbook on Criminal Law* (1972) pp. 371–373; authorities cited in *State v. Mullen* (Iowa 1974) 216 N.W.2d 375, 381; authorities cited in Park, *The Entrapment Controversy* (1976) 60 Minn.L.Rev. 163, 167, fn. 13.) Professor Kamisar observed that only two law review articles in the past 25 years have favored the subjective test. (Kamisar et al., *Modern Criminal Procedure* (4th ed. 1978 Supp.) p. 119.) The Model Penal Code has adopted an objective test (Model Pen.Code (Proposed Official Draft 1962) § 2.13(1); see also Nat. Com. on Reform of Fed.Crim.Laws, Final Rep.—Proposed New Fed.Crim.Code (1971) § 702(2))[.]

*Barraza*, 153 Cal.Rptr. at 466–67, 591 P.2d at 954–55.

The court held that the proper test for entrapment in California asked:

> [W]as the conduct of the law enforcement agent likely to induce a normally law-abiding person to commit the offense? For the purposes of this test, we presume that such a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible;

but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime.

*Id.* at 467, 591 P.2d at 955.

## IX.  ENDS AND MEANS—WHAT IS THE RULE OF LAW?

In examining this impermissible police conduct test, guidance was taken from one or both of two principles:

> First, if the action of the law enforcement agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent, entrapment will be established.  * * *
> Second, affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person will likewise constitute entrapment.

*Barraza*, 153 Cal.Rptr. at 467, 591 P.2d at 955.

Unless we get tough on crime, it is contended that the societal malady which concerns all Americans cannot be erased. I agree. I further believe that unless we get tough on conduct that produces criminal conduct by those seeking to protect society, the process is prostituted and the disease is cultivated. Violence begets violence, inciting crime results in expanded criminality. Generally, releasing, justifying or approving law enforcement officials' conduct in their own criminal behavior, if it exists, cannot fail to do less than create hatred, distrust and reactivity.

Sometimes it is difficult to tell to which team the player belongs without the details of an insider's scorecard. There are truly limits to the practicing validity in a democratic society that the end always justifies the means.[15]

**15.** Justice Brandeis, in his dissent in *Casey*, 276 U.S. at 423, 48 S.Ct. at 376 (footnote omitted), stated:

> I am aware that courts—mistaking relative social values and forgetting that a desirable end cannot justify foul means—have, in their zeal to punish, sanctioned the use of evidence

obtained through criminal violation of property and personal rights or by other practices of detectives even more revolting. But the objection here is of a different nature. It does not rest merely upon the character of the evidence or upon the fact that the evidence was illegally obtained. The obstacle to the

Where our re-examination of the entrapment complicity in our society must start is with the millennium-old question, to what extent does the end justify the means? How much created criminality should society countenance to ennoble its war on crime? Overtly, some balance is required. In this high-tech society, with both emotionally uncontrolled and operationally sophisticated criminals in increasing numbers, law enforcement needs breathing room in techniques and understanding. Regretfully, as Hitler, Stalin, Mussolini, and hundreds of lesser lights proved during this past century, breathing room can turn out democracy and bring in autocratic totalitarianism. Constitutional rights of due process and the basic premise of the responsibility of judiciary to provide fairness in conduct of criminal proceedings must be maintained.

## X. CONCLUSION

Why does it all matter? What do we say to Rivera, the Puerto Rican immigrant, or to the shattered families in Pinedale and Lyman? Who lies, who lives and who regrets? Citizens have a proper office in evaluating the conduct of their judiciary. Unfortunately, the media filter frequently fails to provide a complete, impartial and fair recitation of the facts.

In a law journal article, now written thirty years ago, in the University of Chicago Law Review, entitled Comment, *Administration of the Affirmative Trap and the Doctrine of Entrapment: Device and Defense*, 31 U.Chi.L.Rev. 137, 137 (1963), David P. Bancroft of the United States Department of Justice stated:

[T]he principal police decision that is made in the administration of the device of the affirmative trap is not what inducements to offer, but whether to lay the affirmative trap at all. Field research into the administrative practices of the Cook County State's Attorney's Office reveal marked official insensitivity to the defense. On the basis of an analysis of the interaction of appellate doctrine and administrative practices the author makes recommendations to increase police safeguards in the use of the device and prosecutor sensitivity to the defense. New standards for the scope of the defense are proposed for legislative action.

It is self evident that with the multiplied use of "sting" and "trap" techniques by police, essentially no real progress has been made in many jurisdictions, including the regression in Wyoming, to ameliorate this thirty year old self-evident societal problem. None of the authors' recommendations have even been considered, let alone tested in this jurisdiction. *See* Donnelly, *supra*, 60 Yale L.J. 1091.

Surely now is the time, at least for the Wyoming judiciary and law enforcement, to take serious philosophic cognizance of entrapment defenses. On one hand, we should recognize constitutional rights of a free and non-dictatorial society. On the other side:

Because a demand is made against the criminal process to enforce laws whose breach rarely affords the police complaining victims or witnesses a tension is created: A claim is made on enforcement agencies which cannot be satisfied by standard police techniques. In order to successfully apprehend violators the police need to be present at the time and place the crime is committed. But omnipresence is not a realistic expectation.

---

prosecution lies in the fact that the alleged crime was instigated by officers of the Government; that the act for which the Government seeks to punish the defendant is the fruit of their criminal conspiracy to induce its commission. The Government may set decoys to entrap criminals. But it may not provoke or create a crime and then punish the criminal, its creature. If Casey is guilty of the crime of purchasing 3.4 grains of morphine, on December 31st, as charged, it is because he yielded to the temptation presented by the

officers. Their conduct is not a defence to him. For no officer of the Government has power to authorize the violation of an Act of Congress and no conduct of an officer can excuse the violation. But it does not follow that the court must suffer a detective-made criminal to be punished. To permit that would be tantamount to a ratification by the Government of the officers' unauthorized and unjustifiable conduct. Compare *Gambino v. United States*, 275 U.S. 310, 48 S.Ct. 137.

Behavior offensive to such legislation is likely to be widely dispersed. Time and personnel limitations, largely functions of budgetary considerations, call for selective enforcement in the form of spot control.

Bancroft, *supra*, 31 U.Chi.L.Rev. at 139–40 (citing Joseph Goldstein, *Police Discretion Not to Invoke the Criminal Process: Low–Visibility Decisions in the Administration of Justice*, 69 Yale L.J. 543, 560 (1960)).

It may well be that the conviction of Rivera was justified and fair. We will never know if a properly instructed jury would, necessarily, have reached the same result considering the booby-trapped and mine-field strewn pathway his defense was required to pursue. An appropriate recognition of the controversies surrounding entrapment presents this court with a challenge that what we do is not adequate.

The Abscam cases, the John DeLorean trial for cocaine trafficking, and the Chicago Greylord investigation of judicial corruption [as certainly more pertinently before us in current events in this state] recently brought to public attention the question whether and to what extent a free society should permit its law enforcement officials to provoke crime in order to detect and punish criminals. This question is by no means easy to answer. On the one hand, some involvement in the unlawful activities of criminal rings may be the only effective means to detect many crimes, particularly those that do not involve a complaining victim. To secure the trust and cooperation of the criminals whose activities they seek to uncover, government undercover operatives must be prepared to cultivate a target over a period of time, to make repeated overtures to that target, and to offer some inducement to the target as the price of the agents' admission to the criminal activity. Consequently, police solicitation and inducement of criminal conduct are believed to be necessary in order to investigate and stop crimes that are committed in secret among willing participants.

On the other hand, the use of *agents provocateurs* to obtain evidence against individuals by inducing and participating in criminal acts is a feared tool of government oppression, used historically by repressive regimes seeking to suppress their political opponents. Such a tactic also creates grave risks of leading otherwise law-abiding persons into crime. The combination of an ongoing relationship between the undercover agent and his target, the necessity for the government to offer inducements to secure action by the suspected criminal, the police officer's natural desire for professional success, and the use of informants of uncertain reliability is a mixture with explosive potential for abuse.

Jonathan C. Carlson, *The Act Requirement And The Foundations Of The Entrapment Defense*, 73 Va.L.Rev. 1011, 1011–12 (1987) (footnotes omitted). The author then concluded:

Police encouragement of crime conflicts with the basic values underlying the system of criminal justice, a system founded largely on the theory that one must cause an unlawful act in order to bring about punishment by the state. Even when it seeks to prevent future harm by restraining dangerous individuals, the system is backward-looking and claims past conduct as the justification for identifying, prosecuting, convicting, and punishing a wrongdoer. The rules defining crimes purportedly ensure both that punishment is justified and that the criminal processes are confined within the limits necessary to ensure personal freedom. Police encouragement of crime, however, undermines the rules. It is a social control tactic rooted in concern for the future. Active police encouragement of criminal acts represents, in effect, a form of "preventive *detection.*" It does not seek the punishment of past wrongdoing, nor is it justifiable as punishment of past conduct. Its acceptability as a law enforcement tool is premised on the belief that it is a necessary means to detect and punish those who would otherwise pose a continuing threat to social order. The various con-

ventional approaches to entrapment each seek to make this preventive detection more palatable by ensuring that in some way it is directed against significantly dangerous individuals. The conventional analyses do not, however, make government encouragement of crime any less of a compromise, both of the values normally protected by the act requirement and of our commitment to the rule in the criminal justice system.

The current approach causes fundamental damage to the central principle that punishment must await conduct. Encouragement is—at least in theory—used by the government precisely because no past wrongdoing can be proven. Moreover, individuals are subject to punishment for choices made in a setting in which government intervention has skewed the available options and created strong artificial incentives for lawbreaking. Finally, the government's encouragement of criminal acts effectively circumvents those restraints on arbitrary and discriminatory official actions that are normally imposed by the act requirement. Entrapment tests designed merely to restore the act's significance as evidence of an actor's dangerousness do not, however, remedy the damage that encouragement causes to the law's commitment to imposing punishment on the basis of past conduct, rather than on conduct predicted for the future. This Article proposes that the law turn back to that commitment by punishing encouraged acts only if the acts are truly harmful or if the defendant himself initiates the crime, and by prohibiting the punishment of criminal acts that occur purely on the government's instigation. The law must recognize the present breakdown in its rule-based assumptions, for only then will it develop a response to encouragement that will stem the inroads that this law enforcement tactic

has made on the fundamental values and principles of the criminal law.

*Id.* at 1107–08 (emphasis in original).

*See also* Stavsky, *supra,* 16 Rutgers L.J. at 989, which stated:

The one aspect of entrapment which is universally recognized in the United States is that at some point police encouragement of crime becomes so egregious as to mandate the release of the encouraged defendant. Defining that point is a matter of considerable debate among legal scholars. More attention, however, must first focus upon the basic question of why exculpation of the encouraged defendant is appropriate. Given the general reluctance of the courts to release an otherwise guilty defendant simply because of a procedural irregularity, there must be a deep reason for its acceptance in the context of entrapment. However, none of the rationales commonly tendered for the entrapment defense justify this result.

The explanation lies in the belief that entrapment breaches a basic obligation of the government to allow a defendant to fully and independently choose whether or not to violate the law. Any interference with that choice is in and of itself a violation of that obligation, regardless of whether it meets the technical legal requirements of the traditional entrapment defense.[16]

Entrapment particularly touches the essence of democracy, a statistic autocracy, overruling all real rights on one extreme and uncontrolled individuality on the other. Undoubtedly, within the political mores of presently exasperated crime and unsuccessful "solutions," a considerable segment of our society has a greater craving for security than for freedom. Perhaps as much as anything done by this writer in the last seven years, this case and *Saldana v. State,* —— P.2d —— (Wyo.1993) (No. 90-24), test the fiber of our belief in constitu-

---

**16.** After a review and evaluation of the far reaching authorities and cases, a conclusion can be reached that there is a missing link in analysis of causation and persuasion. Trap programs, war on drugs, stings and attention to societal conduct crime prevention activities have become a major American industry, using perhaps more money than American citizens spend with the food industry; at least multiples of billions of dollars annually. Any major change would involve significant federal (and state) budgetary displacements.

tional law and dignity of the individual in our society. Perhaps Rivera or Compton, or the police in Jackson who started this program, are not what is important to the history of Wyoming, but what about the students and their families in Pinedale and Lyman, or wherever else uncontrolled police. activity, misconduct or perjury are to be permitted as a course of "just doing business?"

Wyoming, in this case, follows none of its historical precedent and not even the clear subjective rule for application to Rivera. What we find here may cause one to

believe that a statement which appropriately could join, in reference to equal rights, the Great Seal of the State with "the end always justifies the means," for in recent justice we do not rely on trust.[17]

I dissent.

---

17. A career, instead of a couple of weeks, could fruitfully be spent in understanding the divergences of justice, justification and deterrence intrinsic to a proper discussion of entrapment law. The fact that no one has really passed this way before in Wyoming adjudicatory history is no reason why it should now be ignored in total in a quickly directed effort to affirm the conviction of Rivera. Obviously, Professor Paul Marcus has spent a good part of his legal career in that endeavor. Unaccounted in this short analysis is a broader array of material not necessarily referenced which should, however, be taken into account: 1 ALI *Model Penal Code and Commentaries*, § 2.13 (1985); 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure*, ch. 5 (1984); Daniel E. Feld, Annotation, *Modern Status of the Law Concerning Entrapment to Commit Narcotics Offense—State Cases*, 62 A.L.R.3d 110, § 2 (1975); Annotation, *Contingent Fee Informant Testimony in State Prosecutions*, 57 A.L.R.4th 643, § 1[b] (1987); Jerry Schreibstein, Note, *Entrapment In Light of Mathews v. United States: The Propriety Of Inconsistency And The Need For Objectivity*, 24 U.S.F.L.Rev. 541 (1990); Leslie W. Abramson and Lisa L. Lindeman, *Entrapment And Due Process In The Federal Courts*, 8 Am.J.Crim.L. 139 (1980); Goldwasser, *supra*, 36 Emory L.J. 75; Troy A. Wolf, Note, *Criminal Law—Persistence Pays: Enforcement Efforts To Solicit Illegal Activity—United States v. Hinton, 908 F.2d 355 (8th Cir.1990)*, 17 Wm. Mitchell L.Rev. 913, 913 (1991) (quoting Justice Felix Frankfurter in *Sherman*, 356 U.S. at 384, 78 S.Ct. at 826, " 'Human nature is weak enough and sufficiently beset by temptations without government adding to them and generating crime.' "); Comment, *The Serpent Beguiled Me And I Did Eat—The Constitutional Status Of The Entrapment Defense*, 74 Yale L.J. 942 (1965). (This is only a portion of the source material and commentator analysis now available.)